NATIONAL WILDLIFE
FEDERATION, Plaintiff,

v.

CONSUMERS POWER
COMPANY, Defendant.

No. G85–1146.

United States District Court,
W.D. Michigan, S.D.

March 31, 1987.

Mark Van Putten, Nat. Wildlife Federation, Ann Arbor, Mich., for plaintiff.

Joseph M. Polito, Honigman, Miller, Schwartz & Cohn Detroit, Mich., for defendant.

Peter A. Marquardt, The Detroit Edison Co., Detroit, Mich., for amicus Electric Utilities.

## OPINION

ENSLEN, District Judge.

The plaintiff in this action is a non-governmental environmental conservation organization that alleges that defendant, a Michigan corporation that supplies electrical energy to millions of Michigan residents, is operating a hydro-electric power plant located on the shores of Lake Michigan in violation of the Federal Water Pollution Control Act Amendments of 1972 (the Clean Water Act) ("CWA" or the "Act"). 33 U.S.C. §§ 1251–1376. The CWA prohibits the "discharge of any pollutant by any person," which prohibition encompasses "any addition of any pollutant to navigable waters from any point source," except in accordance with a permit issued by the Environmental Protection Agency ("EPA") or an EPA-approved state agency, which in this instance is the Michigan Water Resources Commission ("MWRC"). *See* 33 U.S.C. §§ 1311(a) (prohibition on discharge of pollutants), 1342 (permit system), & 1362(12)(A) (definition of a "discharge of a pollutant"). Currently pending before the Court for decision are plaintiff's March 24, 1986 Motion for Partial Summary Judgment and defendant's May 6, 1986 Cross-Motion for Dismissal and/or for Summary Judgment. The parties have extensively briefed the relevant legal issues and have submitted numerous documents and other materials for the Court to consider, and the Court heard oral arguments on the motions on December 9, 1986. In addition, a number of electric utility companies have filed an *amicus curiae* brief and reply brief. For the reasons discussed below, the Court will grant plaintiff's motion for partial summary judgment and deny defendant's cross-motion for dismissal and/or for summary judgment.

This opinion will consist of three parts. First, the Court will discuss the facts and the procedural posture of the case. Second, the Court will identify and discuss the factual issues that defendant argues are material and thus preclude a grant of summary judgment for plaintiff. Finally, the Court will discuss the legal issues the parties have raised in their submissions. Since the standard for deciding motions for summary judgment is well-known, I will not discuss it in this opinion. *See Celotex Corp. v. Catrett,* —— U.S. ——, —— – ——, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265, 273–75 (1986); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Watkins v. Northwestern Ohio Tractor Pullers Associa-*

*tion,* 630 F.2d 1155, 1158 (6th Cir.1980); FRCP 56(c).

## I. *Facts and Procedural History*

The parties do not dispute most of the material facts. The hydro-electric power plant at issue in this case is located on the shores of Lake Michigan just south of Ludington, Michigan. The plant, which the parties refer to as the "facility," is jointly owned by defendant (51%) and the Detroit Edison Company (49%). The Court notes that the Detroit Edison Company has participated in this case as an *amicus curiae.* The facility is designed and operated primarily to provide electricity during hours of peak demand. The Court believes that the following portion of defendant's brief sufficiently summarizes the facility's physical characteristics.

[The facility] consists of two jetties projecting generally westerly into Lake Michigan and situated some distance apart from each other to the north and south, and a north-south breakwater to the west of the two jetties. At or about the shore, and located between the two jetties, is the water diversion structure. Directly to the east of the diversion structure is located a large building housing six turbine-pumps, each of which is connected to an electric generator, which can also be operated as an electric motor, and associated equipment. On top of the adjoining bluff to the east, approximately 400 feet above Lake Michigan and 900 feet east [of the Lake], is situated a large, manmade reservoir or impoundment connected to the generator building by six large penstocks [or pipes] which divert water back and forth through the turbine-pumps between Lake Michigan and the reservoir. The reservoir is approximately 1.3 square miles in area and, when completely filled, has a holding capacity of approximately 27 billion gallons of water. The reservoir is enclosed by an embankment or dike 5.5 miles in circumference. This dike reaches a maximum height of 170 feet, with an average height of 103 feet.... The facility's six penstocks are 1,100 feet long and taper from 28 to 24 feet in diameter as they approach the turbine-pumps.

*Consumer Power Company's Brief* at 5–6.

The facility has twelve intake/discharge openings connected to these six penstocks; two openings per penstock or pipe. It has two modes of operation. In its pumping mode, the facility draws water from the Lake for storage in the reservoir. During periods of peak electrical demand, the facility operates in its power generation mode, in which the water is released from the reservoir, sent through the turbines, and discharged back into the Lake. *See* Affidavit of Paul C. Hittle ¶ 4.C. The facility's maximum flow rate in its power generation mode is thirty-three (33) million gallons of water per minute. It is possible "for more than 20 billion gallons of water a day to pass between the reservoir and Lake Michigan." *Consumer Power Company's Brief* at 6. The facility has "a total generating capacity of 1.8 million kilowatts at full operation." Hittle Affidavit at ¶ 5.D. The discharge of water from the facility is larger than any discharge that the MWRC has ever authorized under the CWA by means of a National Pollutant Discharge Elimination System ("NPDES") permit. Affidavit of Frederick L. Brown, Ph.D. ¶ 12.

Preliminary investigative work for construction of the facility began in January, 1959. Hittle Affidavit ¶ 5.A. Construction of the facility began in July, 1969, and the facility commenced commercial operation in January, 1973. *Id.* In 1969, the Federal Power Commission ("FPC") (now the Federal Energy Regulatory Commission ("FERC")) issued defendant a license to operate the facility pursuant to the Federal Power Act ("FPA"). Three articles of this license address the facility's effect on the fishery resources of Lake Michigan. The first is article 16, which provides in pertinent part that "[t]he licensee shall, for the conservation and development of fish and wildlife resources, construct, maintain, and operate ... [the facility] and comply with such reasonable modifications of the project structures and operation as may be ordered by the Commission...." The second is article 37, which requires defendant to conduct "biological and limnological

studies ... to determine the effects of the project and its operation on the fishery resources of the project area ... and [to] make such modifications in project facilities and operations as may be required under Article 16...." The final article is article 38, which provides that defendant:

> Shall make or pay the cost of making studies ... to determine the location and adequacy of various types of fish barriers at the project and the effect on the species of fish to be found in the project area of negative and positive pressures and pressure changes within the range expected to be found in the scroll case, penstocks, and draft tubes during the operation of the project and shall construct, operate, and maintain or provide for the construction, operation and maintenance of such fish barrier facilities or provide such deeper submergence of the turbine-pump runners and modify other project facilities and their operation as determined necessary to protect the fishery resources of the project area....

*Addendum to National Wildlife Federation Brief* at A–44.

Pursuant to its FPA license, defendant has produced approximately forty reports on the effects of the facility's operation on the Lake's fishery resources. Hittle Affidavit ¶ 3.H. In particular, in 1978 defendant requested the Department of Fisheries and Wildlife at Michigan State University to conduct a study on the facility's effects on the Lake's fishery resources. The department completed the study, which is entitled "Assessment of Larval, Juvenile, and Adult Fish Entrainment Losses at the Ludington Pumped Storage Power Plant on Lake Michigan" (the "Liston Report"), in February, 1981. Although the parties disagree about the actual number of fish and fish remains the facility discharges or extrains into Lake Michigan, the Liston Report states that a substantial number of fish are entrained into the facility, killed during the facility's operation, and then discharged into the Lake. *See* Affidavit of John P. Lawler, Exh. B.

In May of 1986, the FERC requested defendant to develop and to file with the Commission "a plan for mitigation of fishery impacts resulting from operation of the" facility. Supplemental Affidavit of Paul C. Hittle, Ex. A (letter of May 12, 1986 from Kenneth M. Pusateri, Acting Director, Office of Hydropower Licensing). At oral argument, defendant stated that it had filed a mitigation plan in August, 1986. Plaintiff and the Michigan United Conservation Clubs have filed a motion to intervene in the FERC proceeding, and have filed a petition "For Studies Pursuant to Article 38 of the License, for Preparation of an Environmental Impact Statement, for a Hearing, and for Revocation of License or for Order Requiring Installation of Fish Protective Devices, Modification of Operating Procedures, and Other Mitigation." Hittle Supplemental Affidavit, Exs. B & C. Plaintiff stated at oral argument, moreover, that the Michigan Department of Natural Resources ("MDNR") has also filed a petition before the FERC regarding the installation of barriers to prevent fish entrainment at the facility.

In addition to this FERC scrutiny, portions of the facility's operations are currently subject to the scrutiny of the MWRC (and hence the EPA) pursuant to the CWA. Specifically, the facility is subject to a NPDES permit that covers operational wastewater or ancillary discharges through eight pipes that are physically separate from the six pipes or penstocks that carry the turbine generating water. See Addendum to the National Wildlife Federation's Brief at A–415 to A–426. This permit covers the facility's discharges of non-contact cooling water, oil-separator or drainage water, and turbine pit dewatering or turbine seep water. See Hittle Affidavit ¶¶ 4.D. & 4.E. The MWRC first issued this permit in 1975. The permit was revised in 1976 and reissued for another five year term in 1980. The 1980 permit expired on May 31, 1985. Defendant currently is seeking to renew the permit in a proceeding before the MWRC. In July, 1985, after the EPA had indicated it would not object to a reissuance of the permit by the MWRC, *Appendix to Defendant's Brief*, Doc. 24, plaintiff sent a letter to the MWRC indicating its objection to reissuance of the permit without "fur-

ther consideration of the applicability of the Clean Water Act and the Water Resources Commission Act" to the facility's discharge of turbine generating water. *Id.* Doc. 25. The MWRC has been unable to decide whether the CWA covers the facility's discharge of turbine generating water, and hence whether such discharge is subject to the NPDES permit process, and apparently has tabled the matter pending the outcome of this proceeding. *See id.* Doc. 29; *Appendix to Defendant's Reply Brief,* Doc. 1. The Court does note that the Chief of the MWRC's Permits Section, Surface Water Quality Division, who is Mr. William E. McCracken, has stated that he does not believe that the facility's power generation water discharge has to "be authorized in an NPDES permit." Supplemental Affidavit of William McCracken, P.E., ¶ 5.

Unable to obtain relief before the MWRC, plaintiff filed its present action on November 22, 1985, seeking injunctive relief, declaratory relief, and civil penalties under the CWA for defendant's allegedly unlawful discharge of fish remains from the facility into Lake Michigan. Plaintiff requests the Court to declare that (1) the "ground fish remains, fish carcasses, whole dead fish and fish parts" defendant discharges into the Lake at the facility are "pollutants" under the CWA; (2) the facility's discharges of turbine generating water are "point-source" discharges under the CWA; (3) these discharges "add pollutants to the navigable waters of the United States"; and (4) these discharges violate the CWA. It also requests the Court to enjoin defendant from continuing such discharges unless and until it acquires a NPDES permit for them, and to order defendant to pay civil penalties as provided by the CWA. In its motion for partial summary judgment, plaintiff requests the Court to find that defendant's "unauthorized discharge of fish remains from [the facility] is in violation of the Clean Water Act", to order defendant to secure a permit for such discharge, and to schedule further proceedings to determine the appropriate civil penalties. In answer to plaintiff's complaint, defendant denies that it is oper-

ating the facility in violation of the CWA and raises a number of grounds for dismissal of the complaint. Defendant raises and discusses fourteen of those grounds in its cross-motion for dismissal and/or for summary judgment.

## II. *Disputed Factual Issues*

Plaintiff argues that there are no genuine issues of material fact concerning defendant's liability under the Act, and that the liability portion of the case thus is ripe for disposition on the parties' cross-motions for summary judgment. Defendant argues that there are material facts in dispute, and that in any event it is entitled to judgment as a matter of law based on the facts that are not in dispute. The Court has identified five factual issues that require discussion.

The first factual issue is whether the facility is presently discharging fish remains into Lake Michigan. As the Court indicated previously, the primary evidence of such discharges is the 1981 Liston report. Plaintiff acknowledged at oral argument that it is relying primarily, if not exclusively, on the report's findings as the basis for its allegations that the facility is discharging pollutants into the Lake. Defendant took the position at oral argument that there is no evidence in either direction on this issue: *i.e.*, there is neither any recent evidence of discharges of fish remains at the facility nor any evidence to contradict the findings of the Liston report. The Liston report found that the facility does discharge some fish remains into the Lake.

The Court does not believe that this issue presents a genuine issue of material fact that precludes it from granting one of the parties' motions for summary judgment. There is no evidence in the record that the primary factual circumstances underlying the Liston report's conclusions, *e.g.*, the presence of fish in the Lake near the facility and the operation of the facility, have changed since the report was issued in 1981. The Court therefore believes that it would not be reasonable to conclude that the facility is no longer discharging fish

into the Lake, and that the opposite conclusion—that such discharges still occur—is the only reasonable one that it can draw from the facts in the record. The FERC's decision to pursue the fish entrainment issue indicates, moreover, that fish are still being entrained into the facility, and supports an inference that an undetermined percentage of these fish are being killed and discharged back into the Lake.

■ The second factual issue concerns whether the facility's discharge of turbine generating water is subject to the CWA and hence the permit process. Defendant argues that this issue is one of fact and statutory interpretation, citing *National Wildlife Federation v. Gorsuch*, 693 F.2d 156 (D.C.Cir.1982). The Court notes, however, that the court in *Gorsuch* stated that the issue presented was "one of statutory construction," which is a legal question. *Id.* at 164. The district court in *Gorsuch*, moreover, found that although the parties were unable to agree to stipulated facts that would have allowed it to dispose of the case on cross-motions for summary judgment, their factual disputes were not material to the dispositive legal question of whether the discharges at issue in that case constituted "the discharge of one or more pollutants into the navigable waters of the United States from a point source." *National Wildlife Federation v. Gorsuch*, 530 F.Supp. 1291, 1295 (D.D.C.), *rev'd*, 693 F.2d 156 (D.C.Cir.1982). The Court believes that the issues presented in this case similarly involve questions of statutory construction, and that the facts pertinent to their resolution are not in dispute. Given defendant's urging that this Court follow the D.C. Circuit's decision in *Gorsuch*, moreover, the Court questions its apparently contradictory assertion that there remain factual disputes preventing disposition of the case by summary judgment.

■ The third factual issue is whether the appropriate state and federal agencies have determined that the facility's discharge of turbine generating water, and hence of fish remains into Lake Michigan, is not subject to the CWA's permit process. The Court will discuss this issue in detail in part three of this opinion. For now, it notes that the parties do not disagree on the relevant historical facts concerning the actions the EPA, the MWRC, and the MDNR have taken with respect to this discharge. The factual issue defendant presents, rather, if one exists at all, concerns the inferences the Court should draw from these historical facts and how it should interpret them. The Court believes that there thus are no factual disputes for it to resolve, but rather only legal issues concerning the deference it should give to the actions government agencies have taken with regard to the facility's discharge of fish in its turbine generating water. The Court can properly resolve these issues in deciding the parties' motions for summary judgment, particularly since this matter will not be submitted to a jury.

■ The fourth factual issue concerns whether the facility "adds" fish remains to Lake Michigan. Once again, the Court believes that this issue is essentially legal rather than factual in nature. The parties do not disagree about how the facility operates or that the facility has some effect— although how much of an effect *is* in dispute—on fish and other aquatic organisms in Lake Michigan that are drawn into the facility. The Court therefore concludes that this issue does not preclude it from granting summary judgment for one party or the other.

■ Finally, the Court also finds that the fifth factual issue, which is whether the facility's discharge of fish remains adversely affects the quality of Lake Michigan water, does not concern a material fact. Defendant acknowledged at oral argument that the effect, if any, of the turbine generating water's discharge of fish remains on the Lake's water quality is not material to the resolution of the threshold issue of defendant's liability under the Act. The Court agrees. *See* 33 U.S.C. § 1311(a) (except as in compliance with the Act, "the discharge of *any* pollutant ... shall be unlawful") (emphasis added). I note for the record that plaintiff argues that the water quality issue should be addressed in the permit proceeding, while defendant ar-

gues that it is an issue that only the FERC can resolve.

## III. *Legal Issues*

The parties have raised a number of legal issues the Court must resolve. The Court has divided these issues into four groups. The first group consists of those issues that affect the Court's authority to decide the merits of plaintiff's complaint. The second group covers those issues that directly concern the merits of plaintiff's claim. The third group consists of various non-jurisdictional affirmative defenses that defendant has raised. The final group of issues concern whether the Court should enjoin or fine defendant even if it finds that defendant has violated or is violating the CWA.

### A. Jurisdictional and Quasi-Jurisdictional Issues

### 1. Standing to Sue

The Court noted previously that plaintiff is a non-governmental environmental conservation organization. Defendant argues that plaintiff has failed to establish that it meets the standing requirements for bringing suit under the CWA's citizen suit provision. Section 505 of the Act provides that any "person or persons having an interest which is or may be adversely affected" may file a suit under the Act. 33 U.S.C. § 1365(a) & (g). Defendant acknowledges that injury to a person's "esthetic or recreational interests" will suffice to establish the requisite standing. *See Student Public Interest Research Group v. Tenneco Polymers, Inc.*, 602 F.Supp. 1394, 1397 (D.N.J.1985). It argues, however, that plaintiff has failed to allege such an injury in this instance.

■ An organizational plaintiff must satisfy two aspects of the standing requirements to have standing to sue under the CWA. First, it must satisfy the regular requirements for standing, which are threefold: (1) it must show that defendant's allegedly illegal conduct has caused it or its members to suffer some actual or threatened injury; (2) it must show that this injury can be fairly traceable to the chal-

lenged action; and (3) it must show that a favorable decision from the Court will likely redress the alleged injury. *Chesapeake Bay Foundation v. Bethlehem Steel Corp.*, 608 F.Supp. 440, 444 (D.Md.1985). Second, an organizational plaintiff must (1) demonstrate that "its members would otherwise have standing to sue in their own right", (2) establish that "the interests the organization seeks to protect are germane to the organization's purpose", and (3) establish that "neither the claim asserted, nor the relief requested, requires the participation of individual members in the lawsuit." *Id.* at 445.

■ In this case, defendant apparently does not dispute that plaintiff satisfies the second and third requirements for organizational standing. It argues, rather, that plaintiff has not satisfied the first requirement, which in effect encompasses the three normal standing requirements. The Court finds that it must reject defendant's contentions. Plaintiff has submitted affidavits from three of its members, Susan Olson, Mark Niemeyer, and David W. Schaafsma, which indicate that defendant's allegedly illegal discharge of fish remains into Lake Michigan from its power plant adversely affects the recreational and esthetic interests of plaintiff's members. The Court believes that these affidavits suffice to satisfy the first two standing requirements. *See Friends of the Earth v. Consolidated Rail Corp.*, 768 F.2d 57, 61 (2d Cir.1985); *Sierra Club v. SCM Corp.*, 747 F.2d 99, 107 (2d Cir.1984); *Chesapeake Bay Foundation*, 608 F.Supp. at 445; *Tenneco Polymers*, 602 F.Supp. at 1397.

■ The Court also finds that plaintiff has satisfied the third standing requirement. Defendant argues that since the operation of the facility is governed by the FERC under the Federal Power Act, any relief the Court may award would be ineffective because it would require technological changes that the FERC would have to approve and which could not be required under the NPDES permit program. It therefore concludes that plaintiff is not entitled to maintain this suit. *See Valley*

*Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982). Although there is a certain logic to defendant's argument, the Court must reject it. If the Court rules in plaintiff's favor, then it can require defendant to secure a permit for its discharge of fish remains in its turbine generating water at the facility. The parties and other interested persons presumably would raise issues concerning the permit's scope and how defendant would comply with its provisions in the permit-issuing process. The Court sees no basis for it to rule at this time that it would not be able to redress plaintiff's injury.

## 2. Notice of Violation

■ The CWA's citizen suit provision provides that a person may not file suit for an alleged violation of the Act unless he has first given sixty days "notice of the alleged violation (i) to the Administrator, (ii) to the State in which the alleged violation occurs, and (iii) to any alleged violator of the standard, limitation, or order...." 33 U.S.C. § 1365(b)(1)(A). In this case, plaintiff sent letters to the appropriate persons and entities on September 18, 1985, more than sixty days before it filed suit in this Court, informing them of its intent, "after the expiration of the sixty day notice period, ... to file suit against Consumers Power Company under Clean Water Act § 505(a)(1) for discharging pollutants to the navigable waters of the United States without a permit from its Ludington Pumped Storage Plant in violation of § 301(a) of the Clean Water Act." *Plaintiff's Complaint for Injunctive Relief, Declaratory Relief and Civil Penalties,* Exhibit A. Defendant argues that the Court must dismiss plaintiff's complaint because the September 18th notice did not comply with EPA regulations. 40 C.F.R. §§ 135.1–3 (1986). Plaintiff implicitly acknowledges that it may not have complied fully with the regulations, but argues that it fully complied with the statutory requirements, that defendant had actual notice of the matters at issue, and that the Court should excuse any technical noncompliance that may exist.

The Court must reject defendant's argument. Plaintiff's September 18th notice satisfied the requirements established in 33 U.S.C. § 1365(b)(1)(A). The Court also finds that although it could have been more specific, the notice satisfied regulatory requirements. The notice includes (1) "sufficient information to permit the recipient to identify the specific standard, limitation, or order alleged to have been violated," *i.e.,* the prohibition found in section 301(a) of the Act, (2) "the activity alleged to constitute a violation," *i.e.,* the discharge of pollutants from the facility, (3) "the person or persons responsible for the alleged violation," *i.e.,* Consumers Power Company, (4) "the location of the alleged violation," *i.e.,* the Ludington facility, (5) "the date or dates of such violation," *i.e.,* every day of "power generation water discharges," and (6) "the full name, address, and telephone number of the person giving notice." *See* 40 C.F.R. § 135.3(a). This is not a case where the plaintiff either failed entirely to give notice to the appropriate persons or instituted suit prior to the expiration of the sixty-day waiting period. *Compare Walls v. Waste Resource Corp.,* 761 F.2d 311, 316–17 (6th Cir.1985) (suit dismissed where "plaintiffs alleged only constructive notice and not the formal notice required" by statute); *Garcia v. Cecos International, Inc.,* 761 F.2d 76, 78–82 (1st Cir.1985) (RCRA suit dismissed where no notice was given); *Ada-Cascade Watch Co. v. Cascade Resource Recovery, Inc.,* 720 F.2d 897, 906–08 (6th Cir.1983) (Merritt, J., dissenting) (finding that plaintiffs' RCRA suit should have been dismissed where they filed suit one week after giving notice to the relevant persons). In this case, rather, plaintiff gave timely and substantially complete, if not complete, notice to the appropriate persons. Since plaintiff has sufficiently alleged and established the actual notice that the statute and the regulations require, the Court will reject this aspect of defendant's motion. *See Walls,* 761 F.2d at 317.

## 3. No Present Violation

Defendant's third attack on the Court's authority to decide the merits of plaintiff's

claim is that plaintiff has failed to establish that defendant was violating the Act when it filed its complaint. There are two aspects to defendant's attack. First, defendant argues that since there is no direct evidence that the facility currently discharges dead fish into Lake Michigan, plaintiff cannot establish the existence of a present violation of the Act as required by section 505(a)(1). 33 U.S.C. § 1365(a)(1) (providing that a citizen may sue any person "who is alleged to be *in violation*" of the Act) (emphasis added). Second, defendant argues that no violation existed when the complaint was filed because it is not required to secure a permit for its release of turbine generating water from the facility.

The Court must reject both aspects of defendant's attack. The second aspect fails because it is intimately tied to the Court's determination of the merits of plaintiff's claim under the Act. If the Act covers defendant's release of dead fish in its turbine generating water at the facility, then by definition plaintiff's suit is proper under section 505(a)(1). In short, defendant's argument is nonsensical. The Court, moreover, answered defendant's first argument when it determined that one can reasonably infer from the Liston report that the facility continues to discharge dead fish and fish remains into Lake Michigan, even though the quantity of this discharge is disputed. *See* supra at 7–8; *see also* Letter of April 8, 1980 from R.A. Walls to John Scott, attached as exh. A to the Appendix to Plaintiff's Reply Brief; Defendant's Answer, ¶ 19. As plaintiff argues, defendant has produced no evidence indicating that the facility no longer discharges dead fish and fish remains into Lake Michigan, and admitted at oral argument that it has no evidence to contradict the conclusions of the Liston report. For these reasons, the Court need not address the unsettled issue of whether plaintiff can sue solely to recover civil penalties for any past violations of the Act that defendant may have committed. *Compare Chesapeake Bay Foundation v. Gawaltney of Smithfield, Ltd.*, 791 F.2d 304, 308 (4th Cir.1986) (holding that private citizens may sue "to seek civil penalties for past violations of the Act as well as abatement of ongoing violations"), *cert. granted,* —— U.S. ——, 107 S.Ct. 872, 93 L.Ed.2d 827 (1986), *with Hamker v. Diamond Shamrock Chemical Co.*, 756 F.2d 392, 395 (5th Cir.1985) (holding that "a complaint brought under section 1365 must allege a violation occurring at the time the complaint is filed").

4. Preemption

Defendant's fourth argument is that provisions of the Federal Power Act preempt plaintiff's claim under the CWA. Defendant notes that its construction and operation of the facility were and are subject to the control of the FERC under the FPA; that the FERC has the statutory authority and obligation to address and to resolve plaintiff's concerns about the facility's effect on fishery resources; that plaintiff in fact has requested the FERC to address the fishery resource issue; and that the FERC's regulatory powers over hydro-electric projects are sufficiently extensive to preempt any concurrent regulation under the CWA.

Defendant's argument has a certain appeal, and there indeed may be strong policy arguments for allowing the FERC to exercise exclusive jurisdiction over this issue. The Court of Appeals for the District of Columbia Circuit, however, recently agreed with the Court of Appeals for the Second Circuit that hydroelectric facilities subject to the FPA are also subject to federal water pollution control laws, and rejected the proposition that the FPA preempts such laws. *Monongahela Power Co. v. Marsh*, 809 F.2d 41 (D.C.Cir.1987), *rev'g*, 507 F.Supp. 385 (D.D.C.1980) (on which defendant relied); *see Scenic Hudson Preservation Conference v. Callaway*, 370 F.Supp. 162 (S.D.N.Y.1973), *aff'd per curiam*, 499 F.2d 127 (2d Cir.1974). The Court sees no basis for rejecting these decisions, and thus will deny this aspect of defendant's motion.

Plaintiff's participation in the ongoing proceedings before the FERC does not preclude it from also seeking relief

under the CWA. The Court also observes that to a certain extent the FPA and the CWA address different aspects of the facility's effect on Lake Michigan. It appears that under the FPA, the FERC is concerned with reducing the number of fish that are entrained into the facility. The CWA, on the other hand, focuses primarily on the opposite end of the facility's operation: its extrainment of dead fish and fish remains into the Lake.

### 5. Exhaustion of Administrative Remedies

Defendant next argues that the Court should require plaintiff to exhaust its administrative remedies before the FERC and the MWRC before filing suit under the Act. Defendant notes the advantages gained by requiring exhaustion of administrative remedies as a prerequisite to judicial proceedings, and argues that plaintiff's failure to have participated in past proceedings before the FERC, the EPA, and the MWRC concerning the facility's effect on Lake Michigan's fishery resources precludes it from maintaining the present action. Plaintiff responds that the exhaustion of administrative remedies doctrine is inapplicable in this context because in enacting the CWA's citizen suit provision, Congress expressly authorized private parties to file suit without regard to whether they had participated in prior administrative proceedings.

■■■ The Court has given defendant's argument careful consideration, but has concluded that it must reject it. It is important to distinguish between citizen suits that seek to determine whether the Act covers a particular discharge or whether a defendant is operating in violation of a NPDES permit, and suits that seek to challenge particular effluent limitations that the EPA or an appropriate state agency has established in the permit process. The latter kind of proceeding may implicate the administrative exhaustion doctrine. The first kind of proceeding, however, generally would not be subject to the doctrine. In this instance, the Court must follow Congress' intent to allow private parties to maintain suits pursuant to section 505 of the Act even though they may not have participated in prior administrative proceedings. I believe that courts possess the discretion to employ the doctrine of laches to guard against abuse in egregious situations, such as where a private party has consistently and willfully refused to participate in relevant proceedings and seeks to invoke the judicial forum as a means of circumventing the administrative process. As I discuss later in this opinion, however, I do not believe that the doctrine of laches applies in this instance either. I note, moreover, that the MWRC apparently has decided to defer further action on defendant's request for a renewal of its permit pending the outcome of this proceeding. *See* Minutes of March 20, 1986 MWRC Meeting, p. 4. Finally, I find for the reasons stated previously regarding the preemption issue that plaintiff's failure to have participated in prior proceedings before the FERC does not bar its present action under the Act.

### 6. Doctrine of Primary Jurisdiction

■■■ Defendant's sixth argument is closely related to the preceding one. In essence, defendant argues that plaintiff's suit requires the Court to consider issues that fall within the special competence and expertise of the FERC, the EPA, and the MWRC, and that to allow these agencies an opportunity to employ that competence and expertise and to promote uniformity of decision-making, the Court should require plaintiff to proceed first before them. *See Montgomery Environmental Coalition Citizens Coordinating Committee on Friendship Heights v. Washington Suburban Sanitary Commission,* 607 F.2d 378 (D.C.Cir.1979). Plaintiff again argues in response that the primary jurisdiction doctrine is inapplicable in this context, and that the Court should take care not to "frustrate the purpose" of the Act's citizen suit provision. Plaintiff also notes that the MWRC has been unable or unwilling to resolve the issue that is before the Court.

The Court is tempted to invoke the primary jurisdiction doctrine in this instance.

As the D.C. Circuit stated in *Washington Suburban Sanitary Commission*, the doctrine serves the important interests of "allowing the agency to bring its expertise to bear before the court reaches a final decision" and, in some cases, of "avoiding the need for a final decision by the courts altogether." *Id.* at 381. Having reviewed the parties' arguments and the relevant case law, however, I conclude that I cannot justifiably defer to the administrative agencies in this instance.

The Court observes first that since it has already decided that the FPA does not preempt the CWA in this instance, there is no basis for it to defer to the pending FERC proceedings. Second, the Court concludes that plaintiff's case presents issues that it is competent to decide, and with respect to which it sees no basis for deferring to the MWRC or the EPA. Whether the CWA covers the discharge at issue here is a question of statutory interpretation that does not necessarily fall within the special competence of these agencies. *See Legal Environmental Assistance Foundation, Inc. v. Hodel*, 586 F.Supp. 1163, 1169 (E.D.Tenn.1984); *O'Leary v. Moyer's Landfill, Inc.*, 523 F.Supp. 642, 647 (E.D. Pa.1981); *see also Student Public Interest Research Group of New Jersey, Inc. v. Fritzsche, Dodge & Olcott, Inc.*, 579 F.Supp. 1528, 1537 (D.N.J.1984) (noting the argument that "the doctrine of primary jurisdiction should be invoked sparingly where it would serve to preempt a citizen's suit"), *aff'd*, 759 F.2d 1131 (3d Cir.1985).

I do not believe that my decision conflicts with the *Washington Suburban Sanitary Commission* decision because in that case the proceeding before the EPA concerned the contents of a NPDES permit—an issue that clearly implicates the special expertise and competence of the EPA—and not whether a permit should be issued in the first place. The decision in *Potomac River Association, Inc.* similarly is inapplicable in this instance because the issues there primarily concerned whether and under what conditions a permit should be issued, not whether the defendant's activities were even subject to the permit process. *Potomac River Association, Inc. v. Lundeberg Maryland Seamanship School, Inc.*, 402 F.Supp. 344, 352–53 (D.Md.1975). For these reasons, the Court concludes that it must also reject this ground in support of defendant's motion. I further observe that the EPA and the MWRC have failed for over ten years to take any action with respect to defendant's discharge of dead fish in its turbine generating water at the facility. I thus fail to see any reason to defer now to their alleged "primary jurisdiction" to consider this issue. *See also* 33 U.S.C. § 1365(b)(1)(B).

7. Ripeness

Defendant next argues that the Court should dismiss plaintiff's complaint because plaintiff in essence seeks review of the pending MWRC permit proceeding, and absent a final decision by the MWRC there is no basis for the Court to exercise jurisdiction over the matter. The Court must reject defendant's argument for at least three reasons. First, I have already decided that plaintiff need not first bring its complaint to the MWRC and the EPA, and thus have implicitly rejected defendant's premise that a decision "of the merits of the conflict would be an interference with MWRC's statutory authority under both state and federal law, precluding MWRC from applying its own expertise in this case." Defendant's Brief in Response at 58. Any interference that may occur is proper in accordance with section 505 of the Act.

Second, section 505(b)(1)(B) of the Act provides that a private party may not file suit if the EPA or the proper state agency "has commenced and is diligently prosecuting a civil or criminal action in a court of the United States, or a State" to enforce the Act. 33 U.S.C. § 1365(b)(1)(B). The Act does not state that a citizen's suit is barred if there is a permit proceeding pending before the EPA or a proper state agency. *See Student Public Interest Research Group of New Jersey, Inc. v. Monsanto Co.*, 600 F.Supp. 1479, 1482–84 (D.N.J.1985). To accept defendant's argument would in effect mean that a private party could never file suit to enforce the Act if

there was a pending permit renewal proceeding in which that party could raise its concerns. The Court believes that Congress did not intend so to condition a private party's right to enforce the Act.

Third, and finally, the Court finds that to defer to the MWRC's pending proceeding may preclude plaintiff from ever pursuing its claim in this Court. Under defendant's theory, rather, plaintiff apparently would have to bring its claim before the Michigan state courts. *See District of Columbia v. Schramm*, 631 F.2d 854, 859–63 (D.C.Cir. 1980) (holding that the EPA's decision not to veto a state permit is not reviewable in federal court and that "[t]he state courts are the proper forums for resolving questions about state NPDES permits"); *see also Crown Simpson Pulp Co. v. Costle*, 445 U.S. 193, 197 n. 9, 100 S.Ct. 1093, 1095 n. 9, 63 L.Ed.2d 312 (1980) (indicating agreement with cases holding that "the EPA's failure to object to a state-issued permit is not reviewable in the courts of appeals under § 509"). Defendant thus seeks to preclude plaintiff from ever bringing its claim in a federal forum. I believe that such preclusion would vitiate plaintiff's rights under section 505 of the Act.

8. Timeliness and Proper Forum

Defendant's final objection to the Court's authority to decide plaintiff's claim is a variation of its preceding three arguments. Defendant argues that plaintiff is in effect seeking review of the EPA's and the MWRC's prior determinations that the facility's release of dead fish in its turbine generating water is not subject to the permit requirement, and that plaintiff should have challenged either the EPA's decision in federal court under section 509(b)(1)(F) of the Act or the MWRC's decision in state court in accordance with state law. Plaintiff once again argues that it is entitled to invoke its rights under the Act's citizen suit provision. If the Court accepts defendant's argument, then it must dismiss plaintiff's suit as being either untimely, in the wrong forum, or both.

■ The Court must reject defendant's argument for two reasons. First, I agree

with plaintiff that it has the right to proceed with this action under section 505 of the CWA. Second, defendant's argument rests on the faulty premise that the Michigan Water Resources Commission has issued an explicit ruling, which plaintiff could have challenged in the appropriate forum, that the Act does not cover the facility's discharge into Lake Michigan of the dead fish and fish remains that are in its turbine generating water. The Court will discuss this issue in more detail later in this opinion. I merely observe for now that defendant has failed to convince me that the MWRC has issued a decision on this issue that plaintiff could have appealed. It appears, moreover, that in this kind of case a private party has the option of either petitioning the EPA to regulate the discharge in question through the permit process or suing the discharger in court. *See* 33 U.S.C. § 1365(a); *Barcelo v. Brown*, 478 F.Supp. 646, 663–64 (D.P.R.1979), *aff'd in part, vacated in part, and remanded in part sub nom., Romero-Barcelo v. Brown*, 643 F.2d 835 (1st Cir.1981), *rev'd and remanded sub nom., Weinberger v. Romero-Barcelo*, 456 U.S. 305, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982). *But see Schramm*, 631 F.2d at 861 (finding that the EPA's "decision not to review or to veto a state's action on an NPDES permit application" is discretionary). Thus, although defendant's argument is superficially appealing, I must in the end reject it.

In summary, the Court concludes that it is authorized to consider plaintiff's claim against defendant under the Act. Defendant has raised numerous reasons why the Court should not intervene in this matter, and instead should find that plaintiff is attempting to circumvent the administrative process and binding administrative decisions for which the appeal time has long since expired. These reasons are not without merit, and the Court has conducted a considerable amount of research and thinking on the Act's citizen suit provision. In the final analysis, however, I find that defendant has failed to demonstrate that plaintiff should not be allowed to invoke the plain language of section 505.

Congress clearly intended private citizens to play an important role, albeit a limited one in terms of the relief available, in the enforcement of the Act, including section 301(a)'s prohibition of "the discharge of any pollutant by any person" except in accordance with the Act's requirements. See 33 U.S.C. § 1311(a); S.Rep. No. 414, 92nd Cong., 2d Sess., *reprinted in* 1972 U.S.Code Cong. & Admin.News 5288, 5365–67 (advance ed.). In this instance, the appropriate administrative agencies have failed to require defendant to secure a permit for its discharge of dead fish in its turbine generating water at the facility. Having given proper notice of its intent to seek to require defendant to secure such a permit, plaintiff is entitled to a determination of the merits of its claim. Defendant has failed to demonstrate that either the Act itself or judicially created principles of restraint require the Court to reject plaintiff's claim without discussing its merits. Moreover, the effect, if any, the EPA's and the MWRC's failure to have required a permit in this instance should have on the Court's decision properly pertains to the Court's consideration of the merits of plaintiff's claim, and not to the preliminary determination of whether it should exercise its jurisdiction to decide such claim. The Court therefore believes that it may properly proceed to analyze the remainder of the parties' arguments.

## B. The Merits of Plaintiff's Claim

There are six issues the Court must consider in analyzing the merits of plaintiff's claim under the Act:

1. The effect it should accord the D.C. Circuit's decision in *National Wildlife Federation v. Gorsuch*, 693 F.2d 156 (D.C.Cir. 1982), and the prior "determinations" by the EPA and the MWRC that defendant is not required to secure a permit for its discharge into Lake Michigan of the dead fish and fish remains that are in the turbine generating water it releases from the facility.

2. Whether the dead fish and fish remains constitute "pollutants" under the Act.

3. Whether defendant's discharge of dead fish and fish remains in the turbine generating water released at the facility constitutes a discharge from a "point source."

4. Whether such discharge constitutes the "addition" of a pollutant to navigable waters.

5. Whether defendant has secured a permit to cover its discharge of dead fish and fish remains in the turbine generating water at the facility into Lake Michigan.

6. Whether the harm of which plaintiff complains is cognizable under the Act. The Court will consider these issues in the order in which they are listed.

### 1. Agency Determinations and *Gorsuch*

This issue breaks down into two sub-issues: (a) whether either the EPA or the MWRC has determined that defendant need not secure a permit for the discharge at issue in this case; and (b) whether the D.C. Circuit's decision in *Gorsuch* requires the Court to rule against plaintiff.

#### a. Agency Determinations

The Court stated earlier in this opinion that it does not believe that this issue presents any material factual issues, but rather solely an issue of law. The parties do not disagree about the actions the EPA and the MWRC have taken with regard to the facility. Defendant argues, rather, that these actions constitute a determination by these agencies that it need not secure a permit for the dead fish and fish remains it discharges, through its discharge of turbine generating water at the facility, into Lake Michigan.

In its reply brief, defendant states that it has relied on "express, affirmative and repeated EPA and MWRC determinations that an NPDES permit is not necessary for the Facility's turbine generating water release." Defendant's Reply Brief at 8–9. The Court asked defendant at oral argument about the factual basis for this statement. Defendant stated in response that it was not aware of any specific references to the fish discharge issue in the 1975, 1976,

or 1980 permit proceedings. It argued, however, that the EPA has not required similarly situated facilities to secure permits under the Act; that the EPA concurred with the MWRC's decisions to issue the earlier permits, which did not cover the facility's discharge of turbine generating water, and has concurred on the draft renewal of the facility's permit; that William E. McCracken had sent a letter to plaintiff's counsel informing him that the MWRC's position was that defendant need not secure a permit for its discharge of "power generation water," and indicating that the EPA had concurred in this determination; that during 1985 there were repeated—albeit unspecified—statements from the agencies indicating that defendant need not secure a permit; and that Mr. Paul D. Zugger, Executive Secretary for the MWRC, has recommended that the MWRC reissue the permit without coverage of the turbine generating water, stating that this water "is not required to be permitted by EPA." Plaintiff responds that the record contains no express determination by either the EPA or the MWRC that defendant need not secure a permit for its discharge of dead fish and fish remains into Lake Michigan at the facility.

 The Court agrees with plaintiff on this issue. At best, defendant can establish the requisite agency determination by negative implication, *i.e.*, the EPA and the MWRC have not required it to secure a permit for its discharge of dead fish and fish remains at the facility and one therefore is not required. The Court is hesitant, however, to hold that the EPA and the MWRC have expressly exempted defendant from the permit requirement in this instance simply because they have never required it to secure a permit. I am particularly hesitant because the Act's citizen suit provision is designed specifically to allow private parties to enforce the Act when the government has failed to do so, and because defendant stated at oral argument that the fish discharge issue was not raised during the 1975, 1976, or 1980 permit proceedings. I also am not persuaded by the EPA's failure to have reconsidered or revoked its concurrence in the MWRC's draft

permit after plaintiff had contested the MWRC's plan to issue the permit. *See* National Wildlife Federation's Letter to the Court dated December 13, 1986; Consumer Power Company's Letter to the Court dated December 18, 1986.

The Court similarly does not find the other grounds defendant has advanced in support of its position persuasive. Defendant introduced no evidence regarding the reasons for the EPA's actions, or inactions, with regard to similarly situated facilities. The Court thus has no basis for finding that the EPA has established a uniform policy on this matter, and more importantly has no idea of the rational behind such policy if one does exist. The statements by William E. McCracken and Paul D. Zugger demonstrate the MWRC's staff believes that defendant does not have to secure a permit for its discharge of dead fish at the facility. The minutes of the Commission's March 20, 1986 meeting indicate, however, that it has stayed further action on the permit pending the outcome of this proceeding. There thus is no definitive MWRC determination to which the Court should defer. Finally, defendant has failed to elaborate on its statement that it received repeated assurances from the appropriate agencies in 1985 that it need not secure a permit in this case.

In summary, there is little or no evidence in the record before me that either the EPA or the MWRC has expressly determined that defendant need not secure a permit for its discharge of dead fish and fish remains in the turbine generating water at the facility. At best, defendant can rely on the EPA's consistent position that "the section 402 permit system does not apply to dams because they are 'nonpoint sources' of pollution, rather than dischargers of pollutants." *United States ex rel. Tennessee Valley Authority v. Tennessee Water Quality Control Board*, 717 F.2d 992, 998 (6th Cir.1983), *cert. denied*, 466 U.S. 937, 104 S.Ct. 1909, 80 L.Ed.2d 458 (1984). The Court therefore believes that the real issue here is the extent to which the D.C. Circuit's decision in *Gorsuch*, and the Sixth Circuit's decision in *Tennessee*

*Water Quality Control Board,* govern its decision in this case.

b. *Gorsuch* and *Tennessee Water Quality Control Board*

In *Gorsuch,* the National Wildlife Federation, having unsuccessfully tried to convince the EPA of the validity of its position, petitioned the district court for the District of Columbia "for a declaration that the Administrator of the Environmental Protection Agency (EPA) has a nondiscretionary duty to require dam operators to apply for pollutant discharge permits under § 402(a) of the Clean Water Act." *Gorsuch,* 693 F.2d at 161; *see* 33 U.S.C. § 1365(a)(2). The district court ruled for the plaintiff. *Gorsuch,* 530 F.Supp. 1291. The Court of Appeals reversed, holding that the EPA's determination that dams are nonpoint sources of pollution "is reasonable, not inconsistent with congressional intent, and entitled to great deference" and therefore "must be upheld." *Gorsuch,* 693 F.2d at 183. I do not believe the *Gorsuch* decision held that the release of water from a dam can never constitute the addition of a pollutant from a point source. Rather, a court must examine the specific rulings the D.C. Circuit made in *Gorsuch* —of which I count four that are important here—and determine whether those rulings apply to the case before it. I note that in *Tennessee Water Quality Control Board* the Sixth Circuit cited and discussed the *Gorsuch* decision with approval. *Tennessee Water Quality Control Board,* 717 F.2d at 998–999. The Court thus considers itself bound by the D.C. Circuit's interpretation in *Gorsuch* of the EPA's position regarding dams.

▬ The first ruling to consider is the D.C. Circuit's determination that "for dams to require NPDES permits, five elements must be present: (1) a *pollutant* must be (2) *added* (3) *to navigable waters* (4) *from* (5) *a point source.*" *Gorsuch,* 693 F.2d at 165 (emphases in original). The second ruling I must consider is the court's determination that low dissolved oxygen, cold, and supersaturation, which are changes in water condition that occur when water is backed up into a reservoir and then released downstream, are not pollutants under the Act, even though they may "pollute" the water. *Id.* at 171–74. The D.C. Circuit found that the EPA has some discretion to define what substances or changes in water quality constitute pollutants under the Act; that the items at issue were "water *conditions,* not substances added to water," *id.* at 171 (emphasis in original); and that the "Act does not require EPA to treat dam-induced water conditions as 'pollutants.'" *Id.* at 172.

The third ruling I must consider is the D.C. Circuit's decision to uphold the EPA's position that an addition of a pollutant from a point source occurs "only if the point source itself physically introduces a pollutant into water from the outside world." *Id.* at 175. The EPA's position was that "the point or nonpoint character of pollution is established when the pollutant first enters navigable water, and does not change when the polluted water later passes through the dam from one body of navigable water (the reservoir) to another (the downstream river)." *Id.* The court upheld the EPA's decision to reject the National Wildlife Federation's argument that a dam itself can constitute a point source—and hence that "the statutorily necessary 'addition ... from a point source' occurs when (1) a dam causes pollutants to enter the reservoir and (2) the polluted water subsequently passes through the dam—the point source—into the formerly unpolluted river below," *id.* at 174—and to adhere to the position that dams generally do not require permits because "dam-caused pollution ... merely passes through the dam from" the reservoir into the downstream river. *Id.* at 165.

Finally, I must consider the D.C. Circuit's ruling that the EPA has properly determined that a dam, as a singular entity, generally does not constitute a "point source." *See id.* at 174–75. I consider this to be a minor point, however, for two reasons. First, it appears that the major issue in *Gorsuch* was not whether a dam is a point source but rather whether the water quality changes at issue in the case were pollutants and whether the dam added such

changes to the water. *Gorsuch,* 530 F.Supp. at 1297; *see Gorsuch,* 693 F.2d at 165. Second, the court observed in *Gorsuch* that the EPA had acknowledged that "[t]he pipes and spillways through which water flows from the reservoir through the dam into the downstream river clearly fall" within the statutory definition of a "point source." *Id.* at 165 n. 22.

Having thoroughly considered the above rulings and their relationship to this case, the Court finds that the *Gorsuch* decision does not require it to rule in defendant's favor, although it does provide strong guidance on the issues before me. With regard to the first issue, I adopt the five requirements for determining whether an NPDES permit is required in a particular situation, and will apply them to the facts of this case. The Court does not believe that the second ruling is entirely relevant since the court in *Gorsuch* did not decide whether dead fish and fish remains are pollutants under the Act. I do note that unlike the items at issue in *Gorsuch,* dead fish and fish remains are "substances" and not changes in water condition. As I discuss subsequently, therefore, I do not believe that this case presents the issue of whether the Act covers "dam-induced water conditions."

The D.C. Circuit's third ruling in *Gorsuch* does apply in this case. In accordance with that ruling, I must determine whether the point source at issue here introduces pollutants, *i.e.,* dead fish and fish remains, into Lake Michigan from the outside world. Finally, I also find that the court's fourth ruling applies in this instance, even though it is a minor point. I must determine whether the "pollutants" flow through or are discharged from a point source, keeping in mind that the mere passage of water through the facility does not constitute a discharge from a point source.

I do not believe that the discharge from the facility that plaintiff challenges constitutes the kind of discharge that the D.C. Circuit, in *Gorsuch,* and the Sixth Circuit, in *Tennessee Water Quality Control Board,* have found not to require a NPDES

permit. Plaintiff does not challenge a change in water quality resulting from the passive operation of the facility, or a situation in which the facility merely transfers already polluted water from one navigable body of water to another. This is a situation, rather, where water is removed from a navigable body of water, stored in a reservoir, and discharged back into the same body of water, and in the discharge process nonpollutants are transformed into pollutants which then enter the navigable body of water. Since neither of these decisions bars plaintiff's claim *per se,* I must determine for myself whether the facility's discharge of dead fish and fish remains into Lake Michigan requires a permit.

### 2. Definition of Pollutants

The Act defines the term "pollutant" as encompassing "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6). Defendant argues that this definition does not encompass the dead fish and fish remains that are at issue here because the fish are not foreign substances that are added to Lake Michigan, but rather are "natural constituents" of the Lake. It argues that the "Facility releases the same biomass which it initially diverted with the Lake Michigan water" and does not "alter or change the nature" of that biomass. Defendant's Brief in Response at 4.

■ The Court believes that the dead fish and fish remains that the facility discharges into Lake Michigan constitute "pollutants" under the Act, and thus must reject defendant's argument. While fish are a natural constituent of the Lake, and dead fish are also, of course, found in the Lake, it is clear that the facility discharges in an altered form at least some of the fish it draws from the Lake. Defendant does not release the "same biomass" it diverts from the Lake; it transforms the biomass from a living, useful form into a lifeless entity

with no apparent value. Fish, moreover, constitute biological materials, and therefore clearly fall within the definition given in section 1362(6). In addition, although the EPA has some discretion to define what constitutes a pollutant, there is no evidence in the record, other than its failure to have required defendant to secure a permit in this instance, that the EPA has found the discharge at issue here not to be a pollutant. Finally, along this same line, the court in *Gorsuch* did not hold that dead fish and fish remains are not pollutants under the Act. The Court believes that defendant's arguments relate to the issue of whether the facility "adds" pollutants to Lake Michigan rather than whether the dead fish are pollutants, and will consider them in that context.

### 3. Is the Facility a Source Point

 Defendant argues that the facility is a dam or a flow diversion device, and thus under both applicable case law and section 304(f)(2)(F) of the Act constitutes a nonpoint source of discharges into Lake Michigan. Plaintiff responds that section 304(f)(2)(F) does not create a *per se* exemption from the permit requirement for dams and flow diversion devices, and that in any event the facility is not a dam or a flow diversion device. The Court agrees with the plaintiff that section 304(f)(2)(F) is inapplicable, and that the six penstocks through which the facility discharges water into Lake Michigan constitute point sources under the Act.

The Act defines a point source as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14). I believe that the six penstocks that are at issue here constitute "discernible, confined and discrete conveyance[s]," and hence are point sources under the Act. *See Gorsuch*, 693 F.2d at 165 n. 22; *see also Gorsuch*, 530 F.Supp. at 1297 (indicating that penstocks in hydroelectric dams may constitute point sources).

I also believe that defendant's reliance on section 304(f)(2)(F) is misplaced. This section provides that the EPA shall issue information concerning

(1) guidelines for identifying and evaluating the nature and extent of nonpoint sources of pollutants, and (2) processes, procedures, and methods to control pollution resulting from—... (F) changes in the movement, flow, or circulation of any navigable waters or ground waters, including changes caused by the construction of dams, levees, channels, causeways, or flow diversion facilities.

33 U.S.C. § 1314(f)(2)(F). The D.C. Circuit indicated in *Gorsuch* this section means only that Congress recognized that dams and other flow diversion devices can be nonpoint sources of pollution, and intended to have the EPA regulate them by means in addition to the permit system. It does not mean that Congress intended to exempt all of the activities listed in section 304(f) from the permit requirement. *Gorsuch*, 693 F.2d at 168, 168 n. 36, & 177; *see also United States v. Earth Sciences, Inc.*, 599 F.2d 368, 373 (10th Cir.1979) (interpreting section 304(f)(2) as indicating that the categories listed in that section "may involve discharges from both point and nonpoint sources" and holding that "those from point sources are subject to regulation"). The Court therefore finds that the facility's discharge of turbine generating water through the six penstocks constitutes a discharge from a point source.

### 4. Does the Facility "Add" a Pollutant to the Lake

This is the key issue concerning defendant's liability under the Act. It is also the most difficult one to resolve. The Act defines the term "discharge of a pollutant" as meaning, in part, "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12). The EPA believes that an addition of a pollutant occurs under the Act only "if the point source itself physically introduces [the] pollutant into water from the outside world." *Gorsuch*, 693 F.2d at 175; *see also Tennessee Water Quality Control Board*, 717

F.2d at 998 (stating the EPA believes that "for addition of a pollutant to occur within the definition in section 502(12) the point source must introduce the pollutant into the water"). Defendant argues that the EPA's definition of the Act controls here, and that the Court must find that the facility does not add a pollutant to Lake Michigan because the alleged pollutant—the dead fish and fish remains—never leaves the water and hence cannot be "added" to it from the outside world. Plaintiff responds that this is not a case where the dam or flow diversion device, *i.e.*, the facility, merely passes from the reservoir to the downstream river water whose quality the dam has already altered. Plaintiff argues that this is, rather, a case where the facility itself—during the process of discharging the water from the reservoir—simultaneously creates the pollutant and discharges it into the Lake.

This case falls uncomfortably between two paradigms of what the Act does and does not cover through the permit process. On the one hand, the Act's permit requirement clearly covers situations where a point source conveys foreign materials, such as industrial wastes, from the "outside" world into navigable waters. *See, e.g., Earth Sciences, Inc.*, 599 F.2d 368. On the other hand, the D.C. Circuit in *Gorsuch* upheld the EPA's refusal to require permits where the alleged point source, such as a dam, merely conveys polluted water from one body of navigable water to another and does not "add" any pollutants to the water. *Gorsuch*, 693 F.2d at 175; *see also Appalachian Power Co. v. Train*, 545 F.2d 1351, 1377 (4th Cir.1976) (indicating that a discharger is responsible only for pollutants that he adds to the water and discharges through a point source). The facility arguably does not add a pollutant to Lake Michigan from the outside world. Defendant argues cogently that the Lake water does not lose its status as navigable water simply because it is removed from the Lake, and that since the fish never leave the Lake they cannot be added to it from the outside world. Conversely, the facility does not passively transfer polluted water from one body of navigable water to another. It physically removes water from the Lake, holds it, discharges it back into the Lake, and in the intake and discharge process creates pollutants that were not in the water prior to its diversion.

 This is not an easy issue to resolve. I believe, however, that plaintiff's position is more in accord with the Act's purposes and does not conflict with the EPA's interpretation of the Act. As the Sixth Circuit has stated, one of the Act's goals is to eliminate the discharge of pollutants into the navigable waters of the United States "by creating a national pollutant discharge elimination system ... based on the issuance of permits for the discharge of pollutants." *Tennessee Water Quality Control Board*, 717 F.2d at 998. This permit system, however, applies only to discharges of pollutants from a point source, in part because "nonpoint sources of pollution ... are virtually impossible to isolate to one polluter." *Earth Sciences, Inc.*, 599 F.2d at 371. The EPA has determined that whether a pollutant is "added" to navigable waters from a point source or from a nonpoint source is established "when the pollutant first enters navigable water," and does not change when that water simply is transferred from one body of water to another. *Gorsuch*, 693 F.2d at 175. In this case, the pollutant (the dead fish and fish remains) is "added" to the navigable water (Lake Michigan) at a point source (the facility's penstocks). Since the pollutant first enters the navigable waters at a point source, I believe this situation satisfies the EPA's interpretation of the Act. *Compare South Carolina Wildlife Federation v. Alexander*, No. 76–2167–2, slip op. at 11 & 27–28 (D.S.C. April 26, 1982) (finding the addition of low oxygen water did not require a permit because it took place in the reservoir and not when the water was released through the dam's penstocks).

This is not a case where nonpoint source pollution simply flows through the facility; the facility's turbines, rather, create the pollutant in the process of discharging the water into the Lake and generating electricity. I cannot sufficiently distinguish the facility's discharge of dead fish and

fish remains in its turbine generating water from its discharges of pollutants in its noncontact cooling water, oil separator water, and turbine pit dewatering water to say that although the latter discharges require permits, the former does not. I also believe that the Sixth Circuit's decision in *Tennessee Water Quality Control Board,* in which that court indicated the Act's permit requirement may cover pollutants that are added to water during the generation of electricity, supports my ruling on this issue. 717 F.2d at 999. In summary, I find that the facility's discharge of dead fish and fish remains into Lake Michigan through its turbine generating water constitutes the addition of a pollutant to navigable water from a point source, and thus is subject to the Act's permit requirement.

### 5. Does Defendant Have a Permit to Cover this Discharge

Defendant acknowledges that it has no permit for its discharge of dead fish and fish remains into Lake Michigan from the facility. It thus is in violation of section 301(a) of the Act. 33 U.S.C. § 1311(a).

### 6. Is This Discharge Cognizable Under the Act

Defendant argues that plaintiff's real complaint is that fish are diverted from Lake Michigan into the facility's reservoir, and not that the fish are sometimes discharged back into the Lake in altered form. It further argues that the EPA cannot regulate the facility's intake technology and that there is no technology available for removing dead fish from turbine generating water releases. The Court believes that the EPA or the MWRC should resolve these issues in the permit issuing process. The only issue before the Court is whether defendant's discharge of dead fish in its turbine generating water at the facility requires a permit. The appropriate administrative agencies must decide how to remedy this addition of pollutants to the Lake.

### C. Affirmative Defenses to Plaintiff's Claim

Defendant has raised a number of affirmative defenses, some of which relate to the issues the Court discussed in section III.A. of this opinion. Primarily for ease of discussion and organization, however, I have decided to discuss them separately.

### 1. Section 402(k) Immunity

Section 402(k) of the Act provides in pertinent part as follows:

Compliance with a permit issued pursuant to this section shall be deemed compliance, for purposes of section 1319 and 1365 of this title, with section 1311, 1312, 1316, 1317, and 1343 of this title, except any standard imposed under section 1317 of this title for a toxic pollutant injurious to human health.

33 U.S.C. § 1342(k). As defendant argues, section 402(k) "allows [a] permit holder an absolute defense [to an enforcement proceeding] if he can demonstrate compliance with his permit, unless the standard sought to be enforced is a toxic pollutant standard relating to human health." *Inland Steel Co. v. Environmental Protection Agency,* 574 F.2d 367, 370 (7th Cir.1978); *see also E.I. DuPont de Nemours & Co. v. Train,* 430 U.S. 112, 138 n. 28, 97 S.Ct. 965, 980 n. 28, 51 L.Ed.2d 204 (1977) (the purpose of section 402(k) is to give "permits finality"). Defendant further argues that since it has secured a permit for its discharges of pollutants from the facility into Lake Michigan, it can claim the protection section 402(k) offers. Plaintiff responds that defendant must secure a permit for each discharge of pollutants from a point source, and that the permit it has secured for certain point source discharges at the facility thus cannot justify its failure to have secured permits for other point source discharges.

■■■ The Court agrees with plaintiff on this issue. The Act covers the discharge of pollutants on a point source basis. See 33 U.S.C. §§ 1311(a) & 1362(12). That defendant has secured a permit for certain point source discharges at the facility thus does not preclude plaintiff from arguing that there are other point source discharges at the facility for which the Court should also require defendant to secure permits. *See Legal Environmental Assistance Founda-*

*tion, Inc. v. Hodel,* 586 F.Supp. 1163, 1168–69 (E.D.Tenn.1984). I am not persuaded by defendant's argument that its "activities have not taken place surreptitiously." I fail to see the relevance of the lack of secrecy regarding defendant's activities. Defendant simply does not have a permit authorizing it to discharge dead fish or fish remains in its turbine generating water at the facility, and therefore cannot claim the protection of section 402(k).

### 2. Statute of Limitations

Defendant argues that plaintiff's claim for civil penalties under the Act is barred either in whole or in part by the statute of limitations. It argues that the Court should apply either a two-year statute of limitations, under state law, or a five-year statute of limitations, under federal law, to plaintiff's claim. In either case, defendant argues, plaintiff's request for civil penalties would be barred either in whole—if the Court finds that there is no evidence that the facility continues to discharge dead fish and fish remains into Lake Michigan—or in part. Plaintiff responds that no statute of limitations governs its claim for civil penalties.

The Court finds that it should apply the five-year statute of limitations found in 28 U.S.C. § 2462. I decline to apply a state statute of limitations. I, along with several other courts which have considered this issue, believe that application of a state statute of limitations would frustrate several of the Act's policies, and thus is not required even though the Act itself contains no limitations period. *See, e.g., Connecticut Fund for the Environment v. Job Plating Co.,* 623 F.Supp. 207, 211–12 (D.Conn.1985); *Chesapeake Bay Foundation,* 608 F.Supp. at 447–49. I also, however, must reject plaintiff's contention that no statute of limitations applies to its claim for civil penalties. The district courts are split on this issue. *Compare Student Public Interest Research Group v. AT & T Bell Laboratories,* 617 F.Supp. 1190, 1203 (D.N.J.1985) (no statute of limitations applies to section 505 citizen suits) *with Chesapeake Bay Foundation,*

608 F.Supp. at 449 (holding that a five-year federal statute applies). I agree, though, with those courts that have applied the five-year statute of limitations found in 28 U.S.C. § 2462. *See, e.g., Connecticut Fund for the Environment,* 623 F.Supp. at 212–13; *Chesapeake Bay Foundation,* 608 F.Supp. at 449–50. Section 2462 provides as follows:

> Except as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued if, within the same period, the offender or the property is found within the United States in order that proper service may be made thereon.

28 U.S.C. § 2462. I agree with the district court for the District of Maryland that although this statute may not be directly applicable to citizen suits under section 505, it at least applies by analogy. *Chesapeake Bay Foundation,* 608 F.Supp. at 449–50. Plaintiff accordingly may seek civil penalties for violations extending back five years before it filed suit.

### 3. Res Judicata and Collateral Estoppel

Defendant's third affirmative defense is that plaintiff's claim is barred by the doctrines of res judicata and collateral estoppel. Defendant argues that plaintiff could have raised the issue of whether the discharge of dead fish and fish remains in the release of turbine generating water from a dam constitutes the addition of a pollutant from a point source under the Act in the *Gorsuch* case, and that its failure to have done so bars it from now claiming that the facility's discharge of dead fish and fish remains into Lake Michigan violates section 1311(a) of the Act. Plaintiff responded at oral argument that this case and its action in *Gorsuch* involve different legal theories, and that the D.C. Circuit's decision in *Gorsuch* that the EPA is not required to regulate dam-induced changes in water quality through the permit system does not preclude it from arguing that the facility's discharge of dead fish and fish

remains into Lake Michigan falls within the Act's permit requirement.

Defendant has raised a valid issue to which plaintiff has not fully responded. The Court concludes, however, that it must reject defendant's argument. I approach this issue by asking whether plaintiff's present action would be barred if it had raised the issue of the discharge of dead fish and fish remains from dams in the *Gorsuch* proceeding. As defendant argues, the Court can assume that plaintiff was aware of this problem and simply chose not to pursue it before the EPA and the D.C. Circuit. *Cf. Confederated Tribes and Bands of the Yakima Indian National v. FERC*, 746 F.2d 466, 468 (9th Cir. 1984) (noting that fish may be killed when passing through a dam's turbines), *cert. denied sub nom., Public Utility District No. 1 v. Confederated Tribes and Bands of the Yakima Indian Nation*, 471 U.S. 1116, 105 S.Ct. 2358, 86 L.Ed.2d 259 (1985). I believe that all the D.C. Circuit decided in *Gorsuch*, however, was that the EPA is under no general obligation to regulate, through the permit system, discharges from dams that may adversely affect water quality.

The EPA clearly cannot exempt classes of point source discharges of pollutants from the permit requirement. *Natural Resources Defense Council, Inc. v. Costle*, 568 F.2d 1369, 1374–75 (D.C.Cir.1977) (noting that the EPA has the discretion only "either to issue a permit or to leave the discharger subject to the total proscription of § 301"). Concurrently, however, it does have some discretion to determine whether particular discharges require a permit. *Id.* at 1382. As I discussed previously in this opinion, in *Gorsuch* the EPA exercised this discretion and determined that the release from a dam of water whose quality has been adversely affected by the dam's operation does not always constitute the addition of a pollutant from a point source, and thus need not be permitted under the Act. *Gorsuch*, 693 F.2d at 161 & 171. The D.C. Circuit's observation in *Gorsuch*, however, that the parties had agreed "that a dam can, in some circumstances, be a 'point source'", *id.* at 165, means that the significant part of its holding was its finding that the EPA's position on the "addition of a pollutant from a point source" requirement was reasonable and entitled to deference. *Id.* at 165. The EPA's position does not, however, preclude a finding with respect to a particular dam that the discharge of a pollutant through a penstock into navigable water requires a permit. *Id.* at 165 n. 22.

With regard to defendant's res judicata and collateral estoppel defenses, and in answer to the question I posed above, therefore, I believe that the D.C. Circuit's decision in *Gorsuch* resolved only the issue of whether the EPA is required to issue a permit for the discharge from a dam of water that contains pollutants that resulted naturally from either the water sitting in the reservoir or the release of the water on the downstream river. The D.C. Circuit did not decide in *Gorsuch* that all discharges of water from a dam are exempted from the permit requirement and its decision does not preclude a determination that a particular discharge at a particular dam may require a permit.

### 4. Laches

 Defendant's fourth affirmative defense is that the doctrine of laches bars plaintiff's claim. Defendant bases its argument on plaintiff's failure to have participated in the FPA licensure before the FERC and to have participated in the 1975, 1976, and 1980 permit proceedings before the MWRC. I reject defendant's defense for two reasons. First, I find that because plaintiff is in essence acting as a private attorney general in this matter, it probably is not subject to the doctrine of laches, at least absent a showing of some affirmative misconduct. *See Student Public Interest Research Group v. P.D. Oil & Chemical Storage, Inc.*, 627 F.Supp. 1074, 1085 (D.N.J.1986); *United States v. Amoco Oil Co.*, 580 F.Supp. 1042, 1050 (W.D.Mo.1984). Second, and as an alternative basis for my decision, I find that defendant has failed to satisfy the requirements for the application of the doctrine in this case. Laches generally requires a showing of delay plus a resulting prejudice to the defendant. In

this instance, defendant has failed to demonstrate any undue prejudice resulting from plaintiff's delay, if any, in asserting its CWA claim. *Compare Save Our Wetlands, Inc. v. United States Army Corps of Engineers*, 549 F.2d 1021, 1028–29 (5th Cir.) (undue prejudice demonstrated where because project was substantially complete, compliance with environmental statute would produce little if any benefit), *cert. denied*, 434 U.S. 836, 98 S.Ct. 126, 54 L.Ed.2d 98 (1977). The Court therefore must reject its laches defense.

5. Estoppel

 Defendant's final affirmative defense is that plaintiff is estopped from proceeding with this action because it could have raised its concerns before the MWRC in the prior permit proceedings. Once again, the Court believes that plaintiff is not subject to this estoppel defense because it is proceeding as a private attorney general. As I discussed earlier, moreover, the Act does not require plaintiff to have participated in the prior permit proceedings, which in any event did not cover the discharge of dead fish issue. To allow defendant to invoke this defense would seriously impair the effectiveness of the Act's citizen suit provision because it would bar any private citizen who had neglected to participate in a prior agency proceeding from ever raising in a subsequent suit any issues analogous to those that had been considered in that proceeding. A court may have the discretion to invoke the estoppel doctrine in egregious cases where a private party deliberately has ignored potentially dispositive agency proceedings. This is not such a case, however.

D. Issues of Relief

 Defendant has raised two issues concerning the relief to which plaintiff may be entitled now that I have found defendant is in violation of the Act's permit requirement. First, defendant argues that the Court should deny plaintiff any relief because it has relied in good faith on the EPA's and the MWRC's determinations that it need not secure a permit for its discharge of turbine generating water at the facility. The Court must reject this argument for at least two reasons. First, defendant has not demonstrated any undue prejudice resulting from this "reliance." Second, this is neither a criminal proceeding nor a proceeding where defendant faces mandatory fines or penalties. Defendant's reliance may mitigate its liability for civil penalties for its discharges. It does not, however, allow the Court to excuse defendant from future compliance with the Act's permit requirement.

Second, defendant argues that the Court should not grant plaintiff injunctive relief. Since this opinion only resolves the issue of whether defendant is required to secure a permit under the Act, I do not reach that issue at this time.

For the above reasons, the Court will grant plaintiff's motion for partial summary judgment and will deny defendant's cross-motion for dismissal and/or for summary judgment. The parties should submit memorandums within twenty (20) days of the date of this opinion suggesting future scheduling for the remedial phase of this case. Before closing this opinion, the Court believes that it should respond, at least briefly, to the arguments that the electric utilities who have participated in this case as *amici curiae* have raised.

In their original brief, *amici* raise three arguments in support of defendant's position. First, they argue that the Court should defer to the regulatory mechanisms other than the Act's permit requirement that can address the fish entrainment and extrainment problem at the facility. *Amici* note that this problem can be and is being addressed by the FERC pursuant to its authority under the FPA, and that the National Environmental Protection Policy Act also affects the operation of the facility. The Court believes that it adequately addressed this argument in its opinion. I recognize that other regulatory statutes address the problem of fish entrainment and extrainment at the facility. I decline to hold, however, that the existence of these statutes preempts the CWA's requirements, although the EPA and the

MWRC probably can consider the effect of these other statutes in the permit issuing process.

Second, *amici* argue that section 316(b) of the Act, 33 U.S.C. § 1326(b), which concerns the fish entrainment problem, indicates Congress' awareness of this problem and decision to resolve it by regulating the entrainment of fish rather than by requiring effluent limitations and standards for the extrainment of fish. Congress chose, moreover, not to regulate the entrainment of fish at pumped storage facilities such as the one at Ludington, but rather only at power generation facilities that employ water as a coolant. Perhaps more importantly, *amici* argue, although the EPA is well aware of the entrainment problem due to section 316(b), it "has never set effluent limitations or required permits controlling the return of entrained organisms to navigable waters for any facilities." *Amici Brief* at 7. The Court cannot accept *amici*'s arguments. I believe that section 316(b) merely supplements the Act's effluent standards and limitations requirements, and I am hesitant to infer from it a congressional intent to exempt the release of turbine generating water from those requirements. With regard to the EPA's failure to have established effluent standards and limitations for such discharges, the Court discussed the EPA inaction issue earlier in this opinion.

Finally, *amici* reiterate defendant's argument that plaintiff simply is in the wrong forum, and should be raising its claims before the EPA, pursuant to the Act's citizen suit provision, or the MWRC, pursuant to the doctrine of primary jurisdiction. The Court has already discussed and rejected that argument.

In their reply brief, *amici* raise two additional arguments. First, they argue that the EPA has already established a policy, which it has followed since the Act was enacted, of not requiring electric utilities to secure permits for their discharges of turbine generating water, and that the Court should defer to that policy. The Court has already discussed and rejected this argument. Specifically, I find in this record

little evidence of an express determination by the EPA—other than whatever inference one can draw from the EPA's failure to have required defendant to secure a permit—that defendant need not secure a permit for the facility's discharge of dead fish and other aquatic organisms in its turbine generating water. As I stated previously, defendant acknowledged at oral argument that this fish discharge issue was not even raised during the 1975, 1976, or 1980 permit proceedings.

*Amici*'s second argument is that plaintiff's citizen suit is improper because the EPA has already determined that defendant need not secure a permit in this instance, and that plaintiff has failed to recognize the difference between an exercise of prosecutorial discretion, where a citizen suit is proper if the EPA fails to act to correct a clear violation of the Act, and an exercise of administrative discretion, where a citizen suit is improper if the EPA has exercised its discretion to determine that a particular activity does not constitute a violation of the Act. The Court once again has already rejected this argument. I have no evidence that the EPA has exercised its administrative discretion in this instance, and I do not believe that it is unfair to defendant for the Court to determine whether it should secure a permit for the discharge at issue in this case.

In summary, the Court finds that defendant should secure a permit in this instance, and will enter an appropriate order.

### ORDER

In accordance with the opinion dated March 31, 1987;

IT IS HEREBY ORDERED that plaintiff's March 24, 1986 Motion for Partial Summary Judgment is GRANTED;

IT IS FURTHER ORDERED that defendant's May 6, 1986 Cross-Motion for Dismissal and/or for Summary Judgment is DENIED;

IT IS FURTHER ORDERED that defendant is ENJOINED to apply to the Michigan Water Resources Commission within sixty (60) days from the date of this

Order for an NPDES permit authorizing its discharge of pollutants from its turbine generating water point sources;

IT IS FURTHER ORDERED that within twenty (20) days of the date of this Order the parties shall submit memorandums suggesting further scheduling for the remedial phase of this case.