COMITE PRO RESCATE DE LA SALUD, et al., Plaintiffs,

v.

PUERTO RICO AQUEDUCT AND SEWER AUTHORITY, et al., Defendants.

Civ. No. 87–1643 (JP).

United States District Court, D. Puerto Rico.

July 10, 1988.

Anthony Z. Roisman, Cohen, Milstein & Hausfeld, Washington, D.C., Leonard W. Schroeter, Michael E. Withey, Schroeter, Goldmark & Bender, Seattle, Wash., Pedro J. Varela, Hato Rey, P.R., for plaintiffs.

Irwin Flashman, O'Neill & Borges, Hato Rey, P.R., for Westinghouse.

Steven C. Lausell, Jimenez, Graffam & Lausell, San Juan, P.R., for Bristol.

Jose A. Cestero, Andreu Garcia & Andreu Garcia, Hato Rey, P.R., John L. Greenthal, Nixon, Hargrave, Devans & Doyle, Albany, N.Y., for Pridco.

Francisco G. Bruno, Sweeting, Gonzalez & Cestero, San Juan, P.R., Robert Zahler, Shaw, Pittman, Potts & Trowbridge, Washington, D.C., for Perkin Elmer.

Geoffrey Stewart, Hale and Dorr, Washington, D.C., Pedro A. Morell, Brown, Newsom & Cordova, Hato Rey, P.R., for Storage Tek.

Enrique Alcaraz Micheli, Bufete Ferrer & Alcaraz, Mayaguez, P.R., for Syncor and Mayaguez Air Cond.

Alberto Rodriguez–Ramos, Martinez, Odell, Calabria & Sierra, Angel R. De Corral Julia, De Corral & De Mier, Hato Rey, P.R., for Aratex.

Encarnita Catalan Marchan, Puerto Rico Aqueduct & Sewer Authority, Santurce, P.R., Laurie S. Gill, Douglas A. Johns, Palmer & Dodge, Boston, Mass., for Prasa.

Ernesto F. Rodriguez Suris, Hato Rey, P.R., Edilberto Berrios Perez, San Juan, P.R., for Washables and Penntex.

Santiago Mari Roca, Ribas, Biaggi & Mari, Mayaguez, P.R., for Sea Electronics and Stieffel.

Osvaldo Perez–Marrero, Hato Rey, P.R., for Equa Industries.

Jose A. Rivera Mercado, Jose A. Rivera Cordero, Hato Rey, P.R., for Equa and Propper.

Goldman & Antonetti, Santurce, P.R., for Propper.

Charles A. Cordero, Cordero, Miranda & Pinto, Old San Juan, P.R., for Matouk.

Jose M. Biaggi Junquera, Mayaguez, P.R., for Ariela.

Eduardo Estrella, Fiddler, González & Rodríguez, San Juan, P.R., for Cervecería India.

## OPINION AND ORDER

PIERAS, District Judge.

This case concerns alleged violations of federal environmental laws in the Barrio Guanajibo Industrial Park, Mayaguez, Puerto Rico, which have adversely affected the health and environment of the named plaintiffs. Most of the defendants have moved to dismiss the complaint for failure to state a claim, Fed.R.Civ.P. 12(b)(6), or for lack of subject matter jurisdiction, Fed.R.Civ.P. 12(b)(1). The motions to dismiss raise the following significant issues: 1) Whether the plaintiffs have stated a claim under the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6901, *et seq.*;[1] 2) whether the plaintiffs have alleged continuing violations of the Clean Water Act (CWA), 33 U.S.C. § 1151, *et seq.*, and the Clean Air Act (CAA), 42 U.S.C. § 7401, *et seq.*, so as to grant subject matter jurisdiction; 3) whether the plaintiffs have supplied adequate notice of intent to sue under RCRA, CWA, and CAA so as to grant subject matter jurisdiction; 4) whether the plaintiffs have stated a claim against the corporate-parent defendants; and 5) whether the Court should exercise pendent jurisdiction over the nuisance, negligence, trespass, and strict liability claims. Of these five issues, the interpretation of RCRA is clearly paramount.

## I. THE RESOURCE CONSERVATION AND RECOVERY ACT (RCRA)

The plaintiffs allege that the corporate defendants[2] are violating RCRA sections 3010(a), 3005(a), and 7003(a) by discharging

---

1. Defendant Westinghouse contends that its RCRA-based motion to dismiss is based on Fed.R.Civ.P. 12(b)(1), so the plaintiffs have the burden of proving jurisdiction. The Court finds that there is subject matter jurisdiction over this case because the plaintiffs' request for relief under federal law is not frivolous, and in fact, it could be sustained if we give RCRA plaintiff's construction. *See Wheeldin v. Wheeler*, 373 U.S. 647, 649, 83 S.Ct. 1441, 1444, 10 L.Ed.2d 605 (1963); *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).

2. Bristol Meyers Company, Bristol Laboratories, Corp., Bristol Caribbean (referred to jointly as "Bristol"); Ara Services, Inc., Aratex, Inc., (referred to jointly as "ARA"); Ariela, Inc.; Cervecería India, Inc. ("India"); Equa Industries, Inc. ("Equa"); Matouk Industries, Inc. ("Matouk"); Mayaguez Air Conditioning ("Mayaguez A/C"); Perkin–Elmer Corporation, Perkin–Elmer Caribbean (referred to jointly as "PEC"); Propper International, Inc. ("Propper"); Sea Electronics Aids, Inc. ("Sea Electronics"); Sportscaribe, Inc.; Stiefel Laboratories, Inc. (both a Florida corporation and a Puerto Rico corporation, referred to jointly as "Stiefel"); Storage Technology de Puerto Rico, Storage Technology Corporation (referred to jointly as "Storage Tech"); Syncor Industries Corporation ("Syncor"); Westinghouse Electric Corporation, Westinghouse de Puerto Rico, Inc. (referred to jointly as "Westinghouse").

hazardous materials into sewer systems of Barrio Guanajibo Industrial Park. In relevant part, section 3010(a), 42 U.S.C. § 6930, requires a generator of hazardous wastes to file a notification of its activity with the Environmental Protection Agency (EPA). Section 3005(a), 42 U.S.C. § 6925(a), requires owners or operators of hazardous waste storage and disposal facilities to obtain permits from the EPA. Section 7003, 42 U.S.C. § 6973, prohibits hazardous waste activities that may present an imminent and substantial endangerment to health or the environment. In addition, § 7002, 42 U.S.C. § 6972, grants private citizens the right to enforcement of the above provisions in district court.

The plaintiffs make similar allegations against the public corporations.[3] Instead of alleging violations arising from hazardous waste generation, however, the plaintiffs claim that PRASA and PRIDCO store and transport hazardous wastes without proper notification and permits, to the imminent and substantial danger to health and the environment.

The defendants argue that the conduct alleged by the plaintiffs—disposal of hazardous wastes in the industrial park's sewer system—is specifically exempted from regulation by RCRA. Therefore, the complaint fails to state a claim upon which relief can be granted.

### A. Background

Federal regulation of hazardous waste is accomplished as a part of solid waste regulation under RCRA, and RCRA applies to hazardous materials only if they fall within the definition of "solid waste."[4] The defendants' discharges are therefore only to be considered "hazardous wastes" if they first fit the definition of "solid waste."[5] The parties in this case agree that the defendants are commercial operations within the meaning of § 6903(27). Therefore, the materials that the defendants discharge should be categorized solid wastes, subject to RCRA, unless one of the exclusions in § 6903(27) applies (see fn 5). The defendants argue that the phrase "does not include solid or dissolved material in domestic sewage," known as the Domestic Sewage Exclusion (or "DSE"), exempts their activities from RCRA coverage. The plaintiffs contend that the DSE does not encompass the defendants' activities.

In the RCRA regulations, the EPA describes the Domestic Sewage Exclusion as follows:

> (a) *Materials which are not solid wastes.* The following materials are not solid wastes for the purpose of this part: (1)(i) Domestic sewage; and (ii) Any mixture of domestic sewage and other wastes that passes through a sewer system to a publicly-owned treatment works for treatment. "Domestic sewage" means untreated sanitary wastes that pass through a sewer system.

40 C.F.R. § 261.4 (1987). The defendants allege, and the plaintiffs do not contradict the allegations, that whatever materials they discard are dumped into a stream of sanitary wastes that passes through a

---

3. Puerto Rico Aqueduct and Sewer Authority (PRASA) and Puerto Rico Industrial Development Company (PRIDCO).

4. The term "hazardous waste" *means a solid waste, or combination of solid wastes, which because of its quantity, concentration, or physical chemical, or infectious characteristics may—*
    (A) cause, or significantly contribute to an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness; or
    (B) pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed.
42 U.S.C. § 6903(5).

5. The term "solid waste" means any garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial-commercial, mining, and agricultural operations, and from community activities, but <u>does not include solid or dissolved material in domestic sewage,</u> or solid or dissolved materials in irrigation return flows or industrial discharges which are point sources subject to permits under section 1342 of title 33, or source, special nuclear, or byproduct material as defined by the Atomic Energy Act of 1954, as amended (68 Stat. 923).
42 U.S.C. § 6903(27) (underscoring added).

treatment plant owned by PRASA. In the defendants' view, this situation fits the Domestic Sewage Exclusion perfectly, so the chemical discharges are not regulated in any way by RCRA. The defendants claim that their discharges are instead considered to be subject to the pretreatment standards of the Clean Water Act, 33 U.S.C. § 1251 *et seq.*

The plaintiffs argue that the alleged discharges are included in RCRA's coverage because they do not fit the requirement of passing *"through* a sewer system to a publicly owned treatment works for treatment." 40 C.F.R. § 261.4(a)(1)(ii) (emphasis added.) The plaintiffs contend that they have not sued to stop discharges that are treated at a treatment plant; rather they have sued to stop the discharge of wastes that fail to pass through the sewers and remain stuck in the system, damaging health and the environment through leakage or evaporation.

The question before the Court at this time is one of statutory interpretation: assuming plaintiffs' factual allegations to be true, does the Domestic Sewage Exclusion apply to wastes discharged into a sewer system so defective that the wastes never reach a treatment plant? A number of defendants have supplemented their motions to dismiss with affidavits, exhibits, and stipulations of fact, which ordinarily has the effect of converting the motions to ones for summary judgment. Fed.R.Civ.P. 12(b). On the narrow issue of interpreting the Domestic Sewage Exclusion, however, the facts added by this evidence are immaterial; so the Court considers the motions as ones to dismiss the complaint under 12(b)(6).

### B. *Discussion*

■ The Court's analysis begins with the language of RCRA, which seems to indicate that the Domestic Sewage Exclusion exempts the defendants' alleged disposal practices from RCRA regulation. Section 6903(27) excludes material *"in* domestic sewage." Domestic sewage is defined as untreated sanitary waste that passes

through a sewer system. 40 C.F.R. 261.-4(a)(1)(ii).[6] A straightforward reading of this language makes a producer or handler of hazardous waste (as otherwise defined) subject to RCRA if its discarded materials are, for example, buried, placed in caves or mines, placed in landfills, injected into wells, or burned, but not if those materials are dumped into a sewer leading to a publicly owned treatment plant (POTW). This construction of the statute is supported by the introduction section of EPA's request for comments on 40 C.F.R. § 261.4(a):

> "EPA has, therefore, decided that a waste falls within the domestic sewage exemption *when it first enters a sewer system* that will mix it with sanitary wastes prior to storage or treatment by a POTW."

45 Fed.Reg. 33084, 33097 (1980).

The plaintiffs argue that this interpretation of the DSE leaves a huge loophole that could not have been intended by Congress. The plaintiffs urge a broader reading of RCRA, noting that Congress intended "cradle-to-grave" regulation of hazardous wastes as a means of protecting health and the environment. Indicators of such a Congressional intent appear on the face of RCRA: 42 U.S.C. § 6902 establishes the objective of promoting "the protection of health and the environment;" § 6902(a)(4) sets a goal of assurance that "hazardous waste management practices are conducted in a manner which protects human health and the environment;" and § 6902(b) formulates a national policy "that wherever feasible, the generation of hazardous waste is to be reduced or eliminated as expeditiously as possible. Waste that is nevertheless generated should be treated, stored, or disposed of so as to minimize the present and future threat to human health and the environment."

The parties agree that Congress enacted the DSE with the intention that the excluded wastes would be regulated by the Clean Water Act. The plaintiffs argue, however, that broad application of the Exclusion to this case not only defeats RCRA's purpose

---

**6.** The term "Domestic Sewage" is not defined in RCRA itself, only in the regulations.

of protecting health and the environment, it is also inconsistent with the purposes of the Clean Water Act.

The Clean Water Act is a broad remedial statute intended to control discharges of pollutants into the nation's navigable waters. *See e.g., U.S. v. Velsicol Corp.*, 438 F.Supp. 945 (W.D.Tenn.1976). To this end, the Act provides for establishment of effluent standards for treatment plants as well as pretreatment standards for discharges into sewers that lead to treatment plants. The rationale for pretreatment standards is two-fold: first, some substances are incompatible with the design of the treatment plant and interfere with the plant's treatment of other wastes; and second, some substances are not affected by the treatment plant and pass directly through it into tributaries or navigable waters. 33 U.S.C. § 1317(b)(1).[7]

The pretreatment standards represent the portion of the CWA that can be used to control the defendants' discharges into the sanitary sewers. But plaintiffs argue that because the Clean Water Act only aims to prevent interference and pass-through, it does not protect the public from sewer systems that leak, from traps that fail, and from other health dangers arising before the sewage reaches the treatment plant. The plaintiffs contend that because the CWA pretreatment standards have a limited purpose, the dimensions of RCRA's Domestic Sewage Exclusion should be drawn according to that purpose. That is, the DSE should be construed to exempt wastes only to the extent that they are actually controlled by the CWA pretreatment standards.

The plaintiffs claim that this interpretation of § 6903(27) is consistent with EPA's interpretations. Plaintiffs read the phrase "passes through" in 40 C.F.R. 261.4 as limiting the exclusion to the portions of the discharges that pass all the way through the sewer system and actually reach the treatment plant. The preamble to the regulation, cited on page 6 above, states that wastes are excluded when they first enter the sewer system—and plaintiffs read it to apply only to wastes that actually reach the treatment plant for storage or treatment. *See* 45 Fed.Reg. 33097. In other words, wastes that reach POTW are excluded from RCRA from the moment they are discharged; but wastes that never reach the POTW are never excluded from RCRA.

The plaintiffs argue that there is therefore nothing in RCRA or the regulations that is inconsistent with their construction of the Domestic Sewage Exclusion. Moreover, as remedial public health legislation, RCRA ought to be construed liberally, with a narrow reading of any exceptions to its application. *See United States v. An Article of Drug, Etc.*, 394 U.S. 784, 800, 89 S.Ct. 1410, 1419, 22 L.Ed.2d 726 (1969); *Southern Ry. Co. v. Occupational Saf. & H. Review Comm.*, 539 F.2d 335, 338 (4th Cir.1976).

The plaintiffs raise two other arguments that are variations on their primary theory of the inapplicability of the Domestic Sewage Exclusion. The plaintiffs argue that the DSE applies only at the time the waste enters property owned by PRASA, pursuant to 40 C.F.R. § 260.10[8] and 33 U.S.C. § 1362(4).[9] Because PRIDCO or the private defendants allegedly owned some of the sewer mechanisms, and some of the

---

7. These problems are referred to as "interference" and "pass-through."

8. Section 260.10 is the "Definitions" section of the hazardous waste regulations. The following is among the definitions:

"Publicly owned treatment works" or "POTW" means any device or system used in the treatment (including recycling and reclamation) of municipal sewage or industrial wastes of a liquid nature which is owned by a "State" or "municipality" (as defined by section 502(4) of the CWA). This definition includes sewers, pipes, or other conveyances only if they con-

vey wastewater to a POTW providing treatment.

40 C.F.R. § 260.10 (1987).

9. The term "municipality" means a city, town, borough, county, parish, district, association, or other public body created by or pursuant to State law and having jurisdiction over disposal of sewage, industrial wastes, or other wastes, or an Indian tribe or an authorized Indian tribal organization, or a designated and approved management agency under section 1288 of this title.

33 U.S.C. § 1362(4).

wastes allegedly escape before reaching the lines owned by PRASA, the plaintiffs claim that some wastes are escaping before the DSE begins to operate. In essence, the plaintiff is offering a third option for delimiting the DSE. The defendants claim the Exclusion applies at the point of discharge; plaintiffs earlier argued essentially that the Exclusion applies at the point of treatment; and in the alternative, the plaintiffs claim that the Exclusion applies at the point of public ownership. This alternative interpretation finds no support in the regulations. The plaintiffs contend that § 260.10 defines "sewer system" as "that system owned by the POTW." However, no definition for "sewer system" appears in the regulations. The language most similar to that claimed by the plaintiffs is the POTW definition quoted in footnote 8, above. The language of § 261.4(6)(1)(ii) clearly contradicts the plaintiff's construction. That section implicates the DSE whenever hazardous waste passes through a sewer system to a POTW. A sewer system is obviously thought to differ from a POTW, and plaintiffs' attempt to define the system as a sub-part of the POTW is incorrect.

Finally, plaintiffs argue that the Domestic Sewage Exclusion applies only to wastes that are mixed, at some point, with domestic sewage as opposed to industrial sewage, citing an April 15, 1988, Guidance Document by the EPA.[10] The plaintiffs allege that the treatment plant at the industrial park treats or treated only industrial sewage, so any discharges destined for that plant were covered by RCRA.[11] However, there is nothing in the statute or regulations that requires sanitary wastes to derive solely from industrial sources. *See* 40 C.F.R. 261.4(a)(1)(ii). The natural reading of these provisions triggers the DSE whenever hazardous wastes are mixed with domestic wastes, regardless of the source of the domestic wastes. Thus the application of the DSE in this case is the same for both of PRASA's treatment plants.

In support of their interpretation of the Domestic Sewage Exclusion, the defendants rely first on the plain language of the statute and second on the unworkable results of following plaintiff's argument to its conclusion. As noted above, the language of RCRA § 6903(27) and 40 C.F.R. 261.4 seem to indicate that the DSE was intended to exempt producers and handlers of hazardous materials whenever the materials are dumped into a sewer that leads to a POTW.

The DSE has been subject to continuing congressional and administrative attention since its enactment in 1980. RCRA was amended in 1984, and Congress specifically required re-evaluation of the DSE. 42 U.S.C. § 6939.[12] *See* Cong.Rec. H9149–9153

---

**10.** "Industrial waste which mixes with sanitary waste from on-site sanitary facilities for the employees does not necessarily fall under the domestic sewage exemption, the industrial waste must also mix in the municipal sewer system with untreated sanitary wastes from non-industrial sources."
EPA Document, Guidance for Implementing Permit–By–Rule Requirements at POTWs, p. 6. (April 15, 1988).

**11.** It appears that the parties agree that the treatment plant located in Barrio Guanajibo ceased operating in late 1987 and that the industrial park's wastes are now treated in a regional POTW. This fact is nevertheless immaterial because the change in plants is not relevant to the issue of RCRA coverage.
The Court notes that "continuing violation" is not a requisite to a RCRA claim under 42 U.S.C. § 6972(a)(1)(B). This section expressly allows citizen suits to enjoin an imminent and substantial endangerment to health or environment by past and present generators, transporters, or operators of facilities. This is obviously different from the situation in *Gwaltney v. Chesapeake Bay Foundation,* —— U.S. ——, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987) because of the long-term effects of hazardous waste disposal.

**12.** The statute reads, in relevant part:
*§ 6939. Domestic sewage*
(a) Report
The Administrator shall, not later than 15 months after November 8, 1984, submit a report to the Congress concerning those substances identified or listed under section 6921 of this title which are not regulated under this subchapter by reason of the exclusion for mixtures of domestic sewage and other wastes that pass through a sewer system to a publicly owned treatment works. Such report shall include the types, size and number of generators which dispose of such substances in this manner, the types and quantities disposed of in this manner, and the identification of significant generators, wastes, and waste constit-

(daily ed. Nov. 3, 1983). This section mandates a study of the DSE to determine "the extent to which the exclusion is justified and should be modified or eliminated, and the adequacy of pretreatment as a means of dealing with the problem." Cong.Rec. H9150 (Nov. 3, 1983, remarks of Rep. Molinari). The result was a document entitled "The Domestic Sewage Study," presented in February, 1986. Among its findings, the Study identified leakage and evaporation from sewers as potential problems, and it recommended further study. In August, 1986, the EPA issued an Advance Notice of Proposed Rulemaking with respect to implementing the recommendations of the study. 51 Fed.Reg. 30174 (August 22, 1986). And most recently, EPA responded to the comments it received on its proposal. 52 Fed.Reg. 23477, et seq. (June 22, 1987). The defendants argue that this entire process—from the original legislation through the continuing consideration of the DSE—indicates that Congress affirmatively intended to exclude hazardous waste from the point of sewer discharge. Both Congress and the EPA are aware of possible problems from leakage and evaporation, and Congress' preferred course of action is to study the magnitude of the problems as well as the feasibility of alternatives before legislating charges in the DSE. These problems are not unforeseen aberrations that demand a broad reading of RCRA for the sake of the public welfare. The DSE should therefore be interpreted to include the defendant's practices, even if the plaintiffs' allegations of seepage and vaporization are true.

In consideration of all of the above arguments, the Court finds that the defendants' discharges of hazardous materials into the sewer system are not regulated by RCRA due to the Domestic Sewage Exclusion. Notwithstanding general goal of preventing health and environmental hazards, the Court believes that Congress chose to implement the policies of RCRA according to specific requirements that would guide industry and the public. The RCRA interpretation that excludes wastes upon first entry into a sewer system is a more logical and facile construction. This reading of the statute allows the industrial corporations in Barrio Guanajibo to govern their pollution-control practices in accordance with the method used to dispose of their hazardous chemicals. Each company that discharges chemicals into the sanitary sewer is obligated to comply with the Clean Water Act (CWA). This construction also permits PRASA and PRIDCO to conduct their operations with certainty of procedures.

Under the plaintiffs' proposal, each defendant would be forced to consider its sewer discharges to be both hazardous waste under RCRA and a pollutant under CWA. The facilities would then be required to comply with both regulatory schemes either partially or totally. To make this system worse, each corporate defendant would presumedly be obligated to monitor continually the efficiency of the sewer system. Whenever a functioning system breaks down, the defendant would be brought into the double regulation of RCRA and the CWA—through events beyond its control.

It seems clear that Congress intended the simpler system advocated by the defendants. The Court reaches this conclusion not only because such a system avoids double regulation but also because the system provides industry, government, and the public with more efficient and predictable bases for making important waste-disposal decisions.

uents not regulated under existing Federal law or regulated in a manner sufficient to protect human health and the environment.
(b) Revisions of regulations
Within eighteen months after submitting the report specified in subsection (a) of this section, the Administrator shall revise existing regulations and promulgate such additional regulations pursuant to this subchapter (or any other authority of the Administrator, including section 1317 of Title 33) as are necessary to assure that substances identified or listed under section 6921 of this title which pass through a sewer system to a publicly owned treatment works are adequately controlled to protect human health and the environment.
42 U.S.C. § 6939.

In addition, the DSE would have a tortuous effect on the RCRA scheme if it were to apply only wastes actually treated, and not to all those discharged. Sections 6922 and 6924 of Title 42, for example, establish the standards to be used by EPA in its regulation of hazardous waste.[13] Several of these requirements appear to be nonsensical when applied to the defendants here. Section 6922(a)(5) and 40 C.F.R. Part 262 would require the facilities at Barrio Guanajibo to complete a manifest each time they discharged hazardous chemicals into the sewer,[14] designating PRASA and PRIDCO as transporters and treatment facilities, and perhaps identifying malfunctioning sewers as containers. In addition, § 6922(b) would require the facilities to certify that a broken sewer is the "practicable method currently available to the generator which minimizes the present and future threat to human health and the environment." 42 U.S.C. § 6922(b). The requirements for PRASA and PRIDCO, as transporters and treatment facilities would be no more logical. See § 6924(a) above. Moreover, § 6927(e) would require EPA to "thoroughly inspect every facility for the treatment, storage, or disposal of hazardous waste ... no less often than every two years as to its compliance with this chapter." This provision makes little sense when it requires inspection of facilities that are included in the regulations only by virtue of their malfunctioning sewer systems.

The entire regulatory scheme seems obviously intended to govern the most com-

---

**13.** Section 6922(a) reads, in relevant part:
Such standards shall establish requirements respecting—
(1) recordkeeping practices that accurately identify the quantities of such hazardous waste generated, the constituents thereof which are significant in quantity or in potential harm to human health or the environment, and the disposition of such wastes;
(2) labeling practices for any containers used for the storage, transport, or disposal of such hazardous waste such as will identify accurately such waste;
(3) use of appropriate containers for such hazardous waste;
(4) furnishing of information on the general chemical composition of such hazardous waste to persons transporting, treating, storing, or disposing of such wastes;
(5) use of a manifest system and any other reasonable means necessary to assure that all such hazardous waste generated is designated for treatment, storage, or disposal in, and arrives at, treatment, storage, or disposal facilities (other than facilities on the premises where the waste is generated) for which a permit has been issued as provided in this subchapter, or pursuant to title I of the Marine Protection, Research, and Sanctuaries Act (86 Stat. 1052); and
(6) submission of reports to the Administrator (or the State agency in any case in which such agency carries out a permit program pursuant to this subchapter) at least once every two years, setting out—
(A) the quantities and nature of hazardous waste identified or listed under this subchapter that he has generated during the year; ...
(B) the disposition of all hazardous waste reported under subparagraph (A);
(C) the efforts undertaken during the year to reduce the volume and toxicity of waste generated; and

(D) the changes in volume and toxicity of waste actually achieved during the year in question in comparison with previous years, to the extent such information is available for years prior to November 8, 1984.
Section 6924(a), referring to standards for owners and operators of hazardous waste treatment, storage, and disposal facilities, reads in part:
Such standards shall include, but need not be limited to, requirements respecting—
(1) maintaining records of all hazardous wastes identified or listed under this chapter which is treated, stored, or disposed of, as the case may be, and the manner in which such wastes were treated, stored, or disposed of;
(2) satisfactory reporting, monitoring, and inspection and compliance with the manifest system referred to in section 6922(5) of this title;
(3) treatment, storage, or disposal of all such waste received by the facility pursuant to such operating methods, techniques, and practices as may be satisfactory to the Administrator;
(4) the location, design, and construction of such hazardous waste treatment, disposal, or storage facilities;
(5) contingency plans for effective action to minimize unanticipated damage from any treatment, storage, or disposal of any such hazardous waste;
(6) the maintenance of operation of such facilities and requiring such additional qualifications as to ownership, continuity of operation, training for personnel, and financial responsibility (including financial responsibility for corrective action) as may be necessary or desirable; and ...

**14.** The form of the manifest appears in 40 CFR Part 262, Appendix.

mon or acceptable hazardous waste disposal practices. It does not appear to be applicable to disposal through sewer systems, nor to unintended discharges from faulty sewers. The proper interpretation of RCRA therefore excludes from coverage all hazardous materials dumped into sanitary sewers destined for POTW, from the first entry of the chemicals into the sewer system. Congress did not consider the problems of leakage or vaporization from sanitary sewers significant enough to force an additional remedial structure into the RCRA program. Although there is evidence of continuing congressional and administrative concern over these problems, Congress has chosen not yet to address them under RCRA. This Court cannot use the apparent health and environmental problems as a license to redraft RCRA and the DSE. Rewriting RCRA is the sole prerogative of Congress, and this Court must apply the law as it exists at present, not as we think it should read.

This interpretation of RCRA applies equally to all of plaintiffs' RCRA claims, including the allegation of imminent and substantial endangerment under RCRA § 7003. Congress chose to exclude the defendants' practices *by definition* from all RCRA coverage. 42 U.S.C. § 6903(27). Mixtures of hazardous chemicals with domestic waste are not solid waste and therefore not hazardous waste. Although plaintiffs have alleged imminent and substantial danger, they have not alleged that the danger was caused by hazardous waste, within the RCRA definition.

Therefore, because plaintiffs have only alleged conduct that should be protected by the DSE, all RCRA claims are DISMISSED for failure to state a claim upon which relief can be granted.

## II. PENDENT CLAIMS

The plaintiffs allege the right to recover, under the laws of Puerto Rico, for nuisance, negligence, trespass, and strict liability. The amended complaint indicates that some of the defendants and all of the plaintiffs are citizens of Puerto Rico.

Therefore, there is no diversity jurisdiction, and jurisdiction over the tort claims must be based on pendent jurisdiction. The exercise of pendent jurisdiction is a matter of court discretion, taking into consideration judicial economy, convenience, and fairness to the litigants. *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Because the RCRA claims predominate, the Court's dismissal above provides "a powerful reason to choose not to continue to exercise jurisdiction" over the state-law claims. *Carnegie–Mellon Univ. v. Cohill,* —— U.S. ——, ——, 108 S.Ct. 614, 619, 98 L.Ed.2d 720, 730 (1988). All pendent claims are therefore DISMISSED.

## III. CLEAN AIR ACT AND CLEAN WATER ACT

The amended complaint alleges continuous violations of the Clean Air Act (CAA) and Clean Water Act (CWA) against several of the defendants: CAA violations against PRASA, ARA, Ariela, India, Equa, Matouk, Mayaguez A/C, PEC, Propper, Sea Electronics, Sportscaribe, Storage Tech, and Syncor; CWA violations against ARA, Ariela, Equa, PEC, Propper, Sportscaribe, and Stiefel. The defendants variously raise three arguments in support of their motions to dismiss/motions for summary judgment.

■ First, the defendants claim that the notice given them pursuant to CAA § 304(b) [15] and CWA § 505(b) [16] was deficient according to the requirements of 40 CFR §§ 54.3 and 135.3. As in *National Wildlife Federation v. Consumers Power Co.,* 657 F.Supp. 989 (W.D.Mich.1987), the plaintiffs implicitly acknowledge that they may not have complied fully with the regulations, but they argue that they have fully complied with the statutory requirements—that defendant had actual notice of the matters at issue—and that the Court should excuse their technical non-compliance. *See National Wildlife Federation,* 657 F.Supp. at 998. The notice letters sent by plaintiffs in this case effectively notify

---

**15.** 42 U.S.C. § 7604(b).

**16.** 33 U.S.C. § 1365(b).

the defendants of the activity alleged to constitute a violation (the release of specified toxic pollutants to the ambient air or Rio Hondo); the standards violated (that these pollutants were released without permits); the person or persons responsible for the violations (the defendants); the location of the alleged violations (the defendants' facilities in Barrio Guanajibo Industrial Park); and the full name and address of the persons giving notice. Although the notice letters may have been incomplete, this Court follows *National Wildlife Federation* and finds that the plaintiffs have "sufficiently alleged and established the actual notice that the statute and the regulations require ..." 657 F.Supp. at 998.

Second, the defendants argue that plaintiffs have failed adequately to allege continuing violations of the CWA and CAA within the meaning of *Gwaltney v. Chesapeake Bay Foundation*, — U.S. —, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987). In precis, the amended complaint alleges continuing intermittent violations of the Acts in the past and a continuation of the conditions that led to those violations. The Court holds that such allegations satisfy the good-faith standard of *Gwaltney* and are sufficient to establish jurisdiction. *See also Pawtuxet Cove Marina, Inc. v. Ciba-Geigy Corp.*, 807 F.2d 1089 (1st Cir.1986). Once jurisdiction has been established, defendants can prevail on a mootness theory if they show that remedial measures have been taken, that the measures are efficacious, and that risk of further violations has been eradicated. *See Chesapeake Bay Foundation v. Gwaltney*, 844 F.2d 170 (4th Cir.1988). The record in this case contains only defendants' conclusive assertions that they have ceased violations of the Acts, and as such the issue of mootness does not arise.

Third, some defendants challenge the substance of the CWA and CAA claims. Plaintiffs and defendants have submitted documents outside the pleadings that tend to support the existence or nonexistence of *prima facie* violations of the Acts. The Court finds that there exists material facts in dispute with respect to the discharge of pollutants without proper permits, and summary judgment would therefore be improper.

Because the Court finds that the plaintiffs' notice letters to be adequate under CWA and CAA, that the plaintiff's have properly alleged continuing violations of CWA and CAA, and that there are material facts in dispute with relation to CWA and CAA, the motions to dismiss the complaint and for summary judgment under these Acts are hereby DENIED.

## IV. LIABILITY OF CORPORATE PARENTS

Several defendants, including ARA, PEC, and Storage Tech, have moved for dismissal of the complaints against the American corporate parents. The parent corporations can be held liable for their subsidiaries' conduct if the parents' acts or omissions themselves constitute a tort under the laws of Puerto Rico. *Muñiz v. National Can Corp.*, 737 F.2d 145 (1st Cir.1984). A prerequisite to such liability is the assumption of a duty by the parent corporation. *Muñiz*, 737 F.2d at 148. The Court finds that a question of material fact exists as to the extent the parents assumed responsibility for the environmental issues at their subsidiaries' plants in Barrio Guanajibo. Summary judgment in favor of the parent corporations is therefore premature.

The defendants also argue that the parents cannot be held liable for the federal causes of action against their subsidiaries unless the parent and subsidiary are shown to be in fact one corporation. The Court finds that there exists questions of fact as to the separateness of the parents from their subsidiaries. Therefore, summary judgment on this issue would be inappropriate at this time.

Dismissal for lack of personal jurisdiction would also be premature. Even if summary judgment were ultimately granted against the plaintiff on the tort issues, above, Puerto Rico's long-arm statute would still permit exercise of jurisdiction over persons who have transacted business in Puerto Rico. P.R. Laws Ann. Tit. 32, App. III, R. 4.7. This rule has been found

to grant jurisdiction to the full extent of constitutional authority. *Mangual v. General Battery Corp.*, 710 F.2d 15, 19 (1st Cir.1983). The jurisdictional tests are set out in *Escude Cruz v. Ortho Pharmaceutical Corp.*, 619 F.2d 902, 904 (1st Cir.1980) and *A.H. Thomas Co. v. Superior Court,* 98 P.R.R. 864 (1970). As noted in *Escude Cruz,* "[c]onsiderations of 'fair play and substantial justice' require in each case a careful scrutiny of the defendant's activities," *citing International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945). The Court finds that the record has not sufficiently been developed on the issue of the parents' contacts with the forum, Puerto Rico. The Court therefore DENIES the motions to dismiss for lack of personal jurisdiction.

■ Finally, with respect to the American corporate parents, PEC notes that it has never properly been served and asks for dismissal with prejudice. The plaintiffs served PEC by mail, and they argue that such service is permitted by Fed.R.Civ.P. 4(c)(2)(C)(ii). This District Court has held, however, that service by mail is proper only if accomplished within Puerto Rico, unless a federal or state statute specifically provides for service by mail. *San Miguel & Compañia, Inc. v. International Harvester Export Co.,* 98 F.R.D. 572 (D.P.R. 1983). There appears to be no federal or Puerto Rico law specifically providing for service by mail. Therefore, plaintiffs are obligated to serve the non-resident corporate defendants by publication or personal service pursuant to P. R. Laws Ann. Tit. 32, App. III, R. 4.5. Dismissal of the complaint clearly constitutes an overly harsh remedy when there are no allegations of prejudice to the affected defendant. Therefore, the Court ORDERS service by mail upon non-resident corporate defendants to be QUASHED. The plaintiffs are granted leave to serve the corporate parents named in the amended complaint in a manner authorized by the Puerto Rico Rules of Civil Procedure.

## V.  CLASS CERTIFICATION

■ The plaintiffs request in the amended complaint certification of a class consisting of past and present workers in the Barrio Guanajibo Industrial Park and past and present residents of the surrounding community. In light of the Court's dismissal of the RCRA and pendent claims, the Court finds that certification of a class at this time would not be appropriate. Relatively few questions of law and fact remain, and it is not evident how the remaining claims could be more fairly and efficiently maintained by a class. The request for certification is therefore DENIED.

## VI.  FURTHER SCHEDULE

As indicated in the conference on June 8, 1988, the plaintiffs shall have twenty (20) days from the entry of this Opinion and Order to file a motion for reconsideration. The Court understands that the plaintiffs will limit the discussion to the dismissal of claims under RCRA § 7003. The defendants shall oppose the motions of reconsideration within 40 days of the entry of this Opinion and Order. In addition, defendants are granted 20 days to file motions for reconsideration of the partial denial of their motions; and the plaintiffs are granted 40 days from the entry of this Opinion and Order to oppose.

The Clerk shall act accordingly.

IT IS SO ORDERED.